### Daniels, Appellant, *v.* Bethlehem Mines Corporation.

Argued October 3, 1957, Before Jones, C. J., Bell, Chidsey, Musmanno, Arnold, Jones and Cohen, JJ.

*Paul N. Barna,* for appellants.

*Stephen D. Marriner,* for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, January 6, 1958:

This appeal arises from the refusal of the court below to lift a compulsory nonsuit entered in an action to recover damages allegedly caused to appellants' farm and livestock by water discharged thereon from appellee's mine.

On this appeal we review the evidence and all the reasonable inferences therefrom in the light most favorable to the appellant-plaintiffs: *Auel v. White,* 389 Pa. 208, 210, 132 A. 2d 350; *Layman v. Gearhart,* 389 Pa. 187, 190, 132 A. 2d 228; *Seng v. American Stores Co.,* 384 Pa. 338, 345, 121 A. 2d 123.

Since 1950 the Daniels (appellants) have owned a tract of land in West Pike Run Township, Washington County, upon which they operate a dairy farm and maintain a herd of dairy and beef cattle. Two streams or creeks traverse this farm; one stream (known as Little Pike Run), in winding fashion, enters the farm from the northwest, crosses the northwesterly portion, leaves the farm, reenters and again leaves the farm near the southeasterly corner thereof; the other stream enters the farm from the west, crosses the southerly portion in an easterly direction and joins the other stream at a point south of the Daniels' land.

At a point approximately 1½ miles northwest of the farm the appellee operates a bituminous coal mine known as the Ellsworth Mine. For some years water from this mine has been pumped through a twelve inch pipe and discharged into the stream which transports and carries it to and across the Daniels' farm. Up

until June 1953, the water pumped from the mine and discharged into the stream was fit for consumption by cattle and the Daniels' and other lower riparian owners utilized the water from the stream—which never dried up—to water their cattle. This stream constituted the only constant and reliable source of water supply for the cattle because the stream on the farm's southern boundary, at certain times of the year, became dry.

In June, 1953 appellee began pumping highly colored water into the stream which carried mine waste, muck, sludge and other waste materials.[1] This water was not only unfit for cattle consumption but vile in odor and laden with materials which settled in and partially filled up the stream and covered about 1½ acres of the Daniel's farm. From June, 1953—particularly in June, July and August, 1953—until May, 1954 —sometimes in the daytime and sometimes at night— appellee continued to pump this polluted water into the stream. As a result, the stream now dries up during the summertime and the Daniels' have had to dig a well to secure a new source of water supply for their cattle. Because of the flow of this water over their land the appellants have suffered considerable damage not only to the farm land but also to their cattle and dairy business.

The appellee, while denying appellants' allegations, relies principally upon a written instrument under which it claims the right and privilege to discharge this water into the stream. The Daniels' farm had previously been owned by David I. Winnet et al. On August 14, 1946, the Winnets entered into a written agreement with appellee's immediate predecessor in title

---

[1] In the complaint it is described as *"mine water* containing tremendous amounts of acid, sulphur, poison and other deleterious substances". (Emphasis supplied).

under the terms of which the Winnets granted and conveyed "a *right of way* and free right and *privilege to discharge, empty, pour and cause to flow* over lands of [Winnets'] along the course of a branch of Little Pike Run (West Pike Run) where it crosses the premises of [Winnets'], the *mine water pumped, taken or raised from the mine or mines* operated by [appellee's predecessor in title]." This agreement further recited: *"Right of way* hereby granted *to be sufficient for purposes thereof.* Said consideration paid to [Winnets] is in full for said right of way and also the *release* of said [appellee's predecessor in title], its successors and assigns, *from all damages of any character* incident to the flowing over of said premises of the [Winnets'] of the mine water hereinbefore referred to". (Emphasis supplied)

Appellants took the position that this agreement did not bar a recovery of damages by them for two reasons: (1) that the agreement referred only to "*a* branch of Little Pike Run", whereas in fact there were two branches—that which crossed the southern portion and that which crossed the northern portion of the farm—and the agreement referred only to the southern and not to the northern branch which had caused the present situation; (2) that while the agreement granted the right to discharge "mine water", it did not include, cover or contemplate polluted water of the nature and character which appellee discharged into the stream beginning in June, 1953.[2]

Upon completion of appellants' testimony the court below, principally on the ground that the agreement

---

[2] Appellants' first reason was abandoned upon their discovery that the water which entered the stream in the southerly portion of the farm came from an entirely different source and appellee's mine water entered only the stream in the northerly portion of the farm.

barred a right of recovery, entered the compulsory nonsuit herein complained of.

The basic problem involved in this controversy is whether the written agreement bars appellants' right of recovery of damages from appellee. The determination of this question depends on whether the language of the written instrument is sufficiently broad and comprehensive to embrace the type and character of stream pollution which began in June, 1953.

This written instrument contains both a grant and a release: a grant of a right of way and a release of future damages. A "right of way" is granted and conveyed to appellee's predecessor, "its successors and assigns", to "discharge, empty, pour and cause to flow" over the land (now owned by Daniels) and along the course of the stream, "mine water", either pumped, taken or raised from the stream, and such "right of way" is "to be sufficient for purposes" of the instrument. The release covers "all damages of any character" incidental to the flow of "mine water" over the land.

It is clear that the right of way granted was sufficient to encompass the discharge into the stream of "mine water" even though the result of such discharge was to pollute or foul the waters of the stream. Such a grant is neither novel nor unusual. Courts have long recognized that a lower riparian owner—the owner of a servient estate—may, by a grant, confer upon an upper riparian owner—the owner of a dominant estate— the right to pollute or foul the natural waters of a stream, subject only to the limitation that such grant cannot permit the creation of a public nuisance: *Moore v. Stevens Coal Company*, 315 Pa. 564, 568, 569, 173 A. 661; *Brush et ux. v. Lehigh Valley Coal Co.*, 290 Pa. 322, 328, 329, 138 A. 860; *Miskel v. Lehigh Valley Coal Co.*, 85 Pa. Superior Ct. 357, 360; *Hall v. Lund*, 1 H.

& C. 676; *Wright v. Best*, 19 Cal. 2d 368, 121 P. 2d 702; *Johnson v. Armour & Co.*, 69 N. D. 769, 291 N.W. 113; *Luama v. Bunker Hill & Sullivan Mining & Concentrating Co. et al.*, 41 F. 2d 358; *Gross et ux. v. Bunker Hill & Sullivan Mining & Concentrating Co. et al.*, 45 F. 2d 651; Farnham, Water and Water Rights, (Vol. 2) §526, p. 1718; Gould on Waters, §308, p. 599.

In 1946 the Winnets (Daniels' predecessors) owned a right to the use of the waters which formed the stream across their land so long as it remained there and a right to receive such waters in a condition unpolluted by the upper riparian owners, including appellee's predecessor. The Winnets, as owners of these rights, could dispose of them as they saw fit[3] and they entered into an agreement with appellee's predecessor that whatever the latter did which would, by the discharge of "mine water" into the stream, affect their rights and damage their land in any manner would be compensated for in advance in the manner and form provided in the contract. Such a contract is neither illegal nor contrary to public policy. The result of the agreement was that a burden was created upon the servient estate for the benefit of the dominant estate, the burden being on the land rather than the person, which remained against the land even after it passed into the hands of the successors or assigns of the immediate parties. The agreement created an easement in the land binding upon the appellants who acquired the land with notice, actual or constructive,[4] of this easement.

---

[3] The conveyance and grant of these rights was a conveyance and grant of an "interest in the land": Williston on Contracts (Rev. Ed.), Vol. 2, §491.

[4] The agreement was recorded on August 15, 1946 in Washington County.

Appellants urge, however, that appellee discharged into the stream materials and substances, other than "mine water", which were not covered within the terms of the agreement.[5] The testimony indicates that in June, 1953, appellee began discharging reddish colored water into the stream, containing sedimentary substances, variously described as muck, sludge, sulphur, clay, etc., whereas, prior to that date, the water discharged into the stream was colorless and apparently free of sedimentary materials. John S. Lynn, appellants' own witness, familiar with the operation of mines in the area, testified that the water pumped into the stream after June 1953 was "mine waste material" in a liquid form, "sulphur and all the other chemicals that is in coal" or "waste mine water" such as found in mines in the area.

In construing this agreement we are mindful of that which this Court said in *Moore v. Stevens Coal Co.*, supra, 568-569: "In holding as we do that plaintiffs are bound by the contract's terms, we are not heedless of the principle frequently recognized by this court that 'however general the terms may be in which an agreement is conceived, it only comprehends those things in respect to which it appears that the contracting parties proposed to contract; and not others they never thought of': Case v. Cushman, 3 W. & S. 544, 546. Fidelity to this principle does not require courts to indulge in speculations as to the mental processes or expectations of the contracting parties. In interpreting contracts, as in interpreting wills, the guide to intentions is the terms used unless they are ambiguous. The respective rights and obligations which the words of a contract clearly express are the rights

---

[5] Cf: *Miskel v. Lehigh Valley. Coal Co.*, supra, wherein the damage was caused by cribbing of a creek not covered by the grant of the right of way and the release.

and obligations which the courts must recognize and enforce. In Becker v. London Assur. Corp. (1918, H. L.), 117 L. T. Rep. 609, construing an insurance contract, Lord SUMNER said: 'I dare say few assured have any distinct view of their own on the point, and might not even see it, if it were explained to them, but what they intend contractually does not depend on what they understand individually. If it is implicit in the nature of the bargain, then they intend it in law just as much as if they said it in words'. Contracts that project themselves into the long future often give rise to legal relations that one or both parties may never have anticipated. 'No one can ever see very far up the road' but when one has unequivocally committed himself by contract to travel a certain road, he must abide by his commitment".

In determining the intent of parties to a written agreement we look to what they have clearly expressed, for the law does not assume the language of the contract was chosen carelessly: *Commonwealth, to use, v. Henry W. Horst Co. et al.*, 364 Pa. 403, 406, 72 A. 2d 131; *Atlantic Refining Co. v. Wyoming National Bank*, 356 Pa. 226, 232, 51 A. 2d 719; *Moore v. Stevens Coal Company*, supra, 568.

In the coal mining industry, whether in the anthracite or bituminous fields, the elimination of water from the mines presents a very serious problem. Its elimination is an absolute necessity if mining is to continue and, yet, its elimination by discharging it into streams and creeks grievously affects lower riparian owners along these streams and creeks, and, in some instances, the public. Waters which have their source in a coal mine, of necessity, contain deleterious substances as a result of contact with the coal and its various chemical compounds. Any mine water—that is, water which comes from a mine—upon discharge into a stream de-

teriorates and destroys, in varying degrees, the purity and cleanliness of the natural waters of the stream.

The agreement imposed upon appellee no obligation to discharge into the stream only such water as would be fit for consumption by cattle, of clear color and free from deleterious substances; on the contrary, through the medium of this agreement, appellee's predecessor had purchased the right and privilege to discharge into this stream whatever water it pumped, raised or took from the mine, regardless of its nature or its source— whether from an abandoned or active mine working. Granted that the discharge of this mine water into the stream severely damaged appellants' land and cattle, it was protection from that very danger which appellants' predecessor had bartered and bargained away long before appellants became the owners of the land. Of such fact appellants had notice, actual or constructive, when they purchased the land. The "pig in the poke" of appellants' purchase of this farm was the burden in the form of the easement, created by the agreement and imposed upon this land. Whether the water was colored or colorless, odor free or odorous, sediment free or sediment laden with muck, sludge, clay or other materials, it was nevertheless water which came from the mine or "mine water": the agreement gave appellee the right and privilege to discharge it into the stream. The only limitation on appellee's right and privilege was that the discharge of such water into the stream must not constitute a public nuisance[6] nor constitute a violation of the Pure Streams Act so as to render appellee liable to criminal prosecution by the Commonwealth.[7]

---

[6] There is neither claim nor evidence of a public nuisance in this litigation.

[7] Act of June 22, 1937, P.L. 1987, amended by Act of May 8, 1945, P.L. 435, 35 PS §691.1, et seq.

An examination of the terms of this agreement leads irresistibly to the conclusion that appellee's predecessor received from appellants' predecessor the right and privilege to do that of which appellants now complain and that the agreement bars appellants from any recovery against appellee.

Furthermore, the *release* contained in this agreement bars appellants' right of recovery. This release is couched in the most comprehensive terms; it covers *"all"* damages of *"any"* character which are incidental to the flow of "mine water" over the Daniels' land. Whether the damage created by such flow consisted of a filling up of the stream, injury to the farmland itself, deprivation of the cattle's water supply, or any other injury, this release in unmistakable language excludes *all* damage recovery of *any* character sought by the appellants. That this is a release of damages in futuro does not render it invalid. In *Caplan v. Pittsburgh,* 375 Pa. 268, 273, 100 A. 2d 380, the late Mr. Justice STEARNE said: "No case has been cited, and our research has revealed none, which precludes, where public interests are not involved, the enforcement of a *contract not to sue* . . .". In that same case, at pp. 274-275, it was stated: "We have consistently decided that a recorded release or agreement not to sue, binds not only the covenantor but his successors in title. As early as 1869, in Groh v. Eckert, 3 Brewster 116, this Court held that a release of a railroad company by the owner of land from all damages caused by the construction of the railroad does not convey title in the land, but merely released the railroad from damages. In Commonwealth v. Fisher, 1 Penrose & Watts 462, 470, a release was given to the Commonwealth for damages relating to the construction of a canal. The release was upheld against a successor in title. In Shields v. City of Pittsburgh, 252 Pa. 74, 97 A. 124, a release was

sustained relating to a change of grade. In Brush v. Lehigh Valley Coal Co., 290 Pa. 322, 138 A. 860, and Moore v. Stevens Coal Company, 315 Pa. 564, 173 A. 661, releases of future damages were upheld, relating to culm from coal mining operations. In Pennsylvania Range Boiler Co. v. Philadelphia, 344 Pa. 34, 37, 23 A. 2d 723, the principle was affirmed, but the release was not enforced because it was *not recorded*. The opinion writer did state that the release 'creates an interest or right in the land' (p. 39). Obviously this was inadvertent dictum. In Tabor Street (No. 1), 26 Pa. Superior Ct. 167, release of damages because of grading of street was upheld. Kellert v. Rochester & Pittsburgh Coal & Iron Company, 226 Pa. 27, 74 A. 789, and Atherton v. Clearview Coal Co., 267 Pa. 425, 110 A. 298, were coal mining cases. The owners of the surface of land released owners of mining rights from all future damage due to faulty mining and surface subsidence. The releases were held valid. And in Manius v. Housing Authority of the City of Pittsburgh, 350 Pa. 512, 39 A. 2d 614, an agreement between the authority and tenant was held valid which released the authority from all damages from its negligence."[8]

Lastly, appellants urge that appellee's actions constituted a violation of the Pure Streams Act of 1937, supra, and, by reason of that fact, a right of recovery of damages should exist. The language of the court below in this respect is most apt: "Nor can the Court

---

[8] Williston on Contracts (Rev. Ed.), Vol. 6, §1823, pp. 5165, 5166: "Such discharges intended to operate in the future may be in the form of a waiver or of a promise, as well as of a release or covenant not to sue. In any case, if supported by sufficient consideration or by a seal, where seals still have their common law effect, it is given the effect of a contract not to assert a right of the sort described. Such contracts are valid unless opposed to public policy."

find anything in the Pure Streams Law of Pennsylvania to justify the position of the plaintiffs, that notwithstanding the binding effect of the right of way and release in question, the defendant is liable to the plaintiffs under the evidence produced. Without discussing the possible rights of the Commonwealth under said Act with respect to the situation here disclosed, it is sufficient to say that as to these plaintiffs the same rule set forth above holds true, that the protection afforded the defendant by the right of way and releases in question, extends to any liability to the plaintiffs resulting from any possible violation by the defendant of the said Pure Streams Law."

Sympathy for the plight in which appellants find themselves cannot justify us in ignoring the clear terms of the agreement granting the right of way and including the release. Appellants' inability to recover damages for the injuries to their land and livestock arises from the easement placed upon their land by their predecessor in title, a burden of which they should have taken cognizance before they purchased this land.

Judgment affirmed.

Mr. Justice MUSMANNO and Mr. Justice COHEN dissent.