558 A.2d 562

**PBS COALS, INC., a Pennsylvania Corporation, Appellee,**

v.

**BURNHAM COAL COMPANY, a Pennsylvania Corporation, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 14, 1988.

Filed May 10, 1989.

---

Richard Disalle, Pittsburgh, for appellant.

Anthony J. Polito, Pittsburgh, for appellee.

Before DEL SOLE, JOHNSON and MONTGOMERY, JJ.

DEL SOLE, Judge:

This is an appeal from a final decree in equity entered in a declaratory judgment action. Appellee, PBS Coals, Inc.,

(PBS) sought a declaration that it was not responsible for the costs of correcting a mine drainage problem where the agreement transferring interests in the subject properties did not include specific language allocating such a burden. The trial court determined that the agreement imposed no obligation upon PBS to treat the after-discovered drainage problem. We reverse.

The record reveals that Appellant, Burnham Coal Company, (Burnham) drafted an agreement by which it transferred its interests in certain strip-mining properties to PBS. One of the properties being transferred was in need of reclamation work, and the parties acknowledged the estimated cost of reclamation by agreeing upon a reduced price for a piece of equipment to be sold as part of the transaction. The agreement also acknowledged that any obligations owed by Burnham to property owners under previous agreements would be assumed by PBS. An inspection of the dragline to be sold to PBS was made by a PBS official while the equipment sat on snow-covered property which was also to be transferred by the agreement. After the agreement was executed, Burnham withdrew from the property, and PBS began the process of reclaiming the land.

It was not until the Spring thaw that an acid water discharge was discovered on one of the transferred properties, that which a PBS official had visited earlier in order to inspect the equipment being sold by Burnham. The parties agree that if the problem existed at the time the agreement was signed, neither was aware of it. After the drainage was discovered, the parties met at the site and discussed various options for treating it. Although PBS denied that it was responsible for correcting the situation because it had never mined the property and Burnham had, the fact that PBS had men and equipment on site and that a generally amicable business relationship still existed between the parties caused PBS to make the initial efforts to correct the situation. PBS, by this course of conduct, also hoped to prevent the drainage problem from adversely affecting the other five permits issued on the transferred properties. If

a violation had been discovered on property covered by one of the permits, all other permits issued under the same mine drainage permit would have gone into violation; such an occurrence would have prevented PBS from mining any remaining coal and would have resulted in the loss of revenue it expected to gain when it entered into the agreement with Burnham. Because the DER will not issue a permit to any coal company whose operations are in violation of DER regulations, PBS would have been significantly impaired in its coal mining operations if it had been required to have the permit covering the subject property placed in its name. Because of the drainage problem, PBS refused to tender the $276,000 balance which it owed Burnham for the equipment transferred earlier as part of the transaction. Discussions took place between the parties regarding the outstanding debt, the drainage problem and the DER permits. A letter was eventually signed by both parties in an effort to resolve the situation. Burnham agreed to maintain the relevant DER permit in its name, and PBS agreed to remit the balance of its outstanding debt.

Upon discovery of the discharge by the Pennsylvania Department of Environmental Resources (DER), Burnham was advised that penalties would be assessed against it pursuant to the Pennsylvania Clean Streams Law, 35 P.S. § 691.1 et seq. and the Surface Mining Conservation and Reclamation Act, 52 P.S. § 1396.1 et seq. unless measures were taken to correct the problem. Burnham notified PBS that when such penalties were assessed, Burnham would seek to enforce the agreement, which it asserted, placed responsibility for complying with leasehold obligations, including environmental laws, upon PBS. PBS subsequently instituted this action, and Burnham filed a counterclaim seeking reimbursement for the costs incurred in treating the discharge under a consent adjudication with the DER. The trial court found the agreement ambiguous and admitted extrinsic evidence in order to clarify the parties' intent. Having considered the circumstances under which the parties negotiated, the trial court interpreted the agreement as imposing only reclamation liabilities.

Burnham argues that the agreement was unambiguous and that it was error for the trial court to admit extrinsic evidence. Specifically, Burnham maintains that it was error for the trial court not to adopt the common meaning of the term 'as is'. " when reviewing Paragraph 3 of the agreement in question. That section states: "PBS agrees that it will accept the properties upon which Burnham has operated under any of the agreements assigned hereby "as is." The term "as is" has been accepted in the context of the sale of goods as meaning without implied warranties and with all faults. *See* 13 Pa.C.S. § 2316(c)(1). It is Burnham's view that the clause obligates PBS to assume all liabilities, of whatever origin.

The use of the term, "as is" in the context of a transfer of real property interests presents a question of first impression in Pennsylvania. Other jurisdictions, however, have addressed the issue. In *Craven v. Elmo*, D.C.App., 442 A.2d 526 (1982), the sales contract which effectuated a property transfer contained an "as is" clause. The purchaser refused to proceed with the sale unless all outstanding housing code violations on the premises were corrected. The District of Columbia Court of Appeals held that the property was intended to be sold "as is," thereby relieving the seller of any contractual obligation to remedy the violations. Similarly, in *1845 Ocean Associates v. Stein*, 87 A.D.2d 765, 449 N.Y.S.2d 54 (1982), the sales contract transferring an apartment building contained an "as is" clause. After the closing, it was discovered that the building's compactor was not in working order. The purchasers were denied the damages they sought for the cost of repair since the passing of title on an "as is" basis was held to extinguish any claim for after-discovered defects or breakdowns. The court also stated that the buyer's remedy is to inspect prior to closing in order to make adjustments at the time of closing. While these cases involve the transfer of real property in the form of physical structures, an "as is" clause has also been employed in the transfer of undeveloped land. In *In re Hawaii Daiichi–Kanko, Inc.*, 24 B.R. 163 (Bankr.D.Haw.1982), forty-four acres were conveyed

under an agreement which contained an "as is" clause. The court held that the term "as is" means that the property is to be sold in its then-existing physical condition. Quoting an earlier case, the opinion pointed out that "as is" merely means that the purchaser must take that for which he bargained. And finally, in *Lenawee County Bd. of Health v. Messerly*, 417 Mich. 17, 331 N.W.2d 203 (1982), the court interpreted an "as is" clause to mean that the risk of loss was to be placed upon the purchasers of an apartment building. If the "as is" clause was to have any meaning at all, the court held, it must be interpreted to refer to those defects which were unknown at the time that the contract was executed. We find the reasoning of these cases, in light of the particular facts of the instant case, to be persuasive.

■■■ The paramount goal of contractual interpretation is to ascertain and give effect to the intent of the parties. *Greene v. Oliver Realty Inc.*, 363 Pa.Super. 534, 526 A.2d 1192 (1987). In determining the intent of parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly. *Daniels v. Bethlehem Mines Corp.*, 391 Pa. 195, 137 A.2d 304 (1958). Here, the agreement contained a term which has common meaning; when something is accepted "as is" the buyer is put on notice that there may be liabilities attendant to the purchase. The warranties which may otherwise be implied by law do not attach when the buyer agrees to accept the goods in the condition in which they are found. While the harshness of placing the risk of loss in such a situation on an inexperienced consumer has sometimes been avoided by the courts, the facts of this case do not present us with a basis for relieving PBS of the burden here. The individuals who signed this agreement are seasoned businessmen who can safely be presumed to be familiar with terms of common usage in business transactions. The fact that the "as is" clause was applied to a transfer of real property interests as opposed to the sale of goods is not a sufficient basis

for permitting PBS to plead ignorance of the meaning of that term. If PBS intended to avoid any potential liability arising from the purchase of these properties, it was necessary to bargain for a clause to that effect before executing the agreement. This is especially true where a PBS official testified that acid water is one of the company's primary concerns when inspecting sites for potential mining operations. (N.T. 9/17/86 at 117). In the absence of allegations of fraud, mistake, overreaching or the like, it is not the function of the court to redraft a contract to be more favorable to a given party than the agreement which that party chose to enter. *Borrell v. Borrell*, 346 Pa.Super. 1, 498 A.2d 1339 (1985). PBS has not alleged that the agreement was executed under circumstances which would require the court to exercise its equitable powers in order to avoid an injustice. Accordingly, it was error for the trial court to conclude that the agreement imposed no obligation upon PBS to treat the after-discovered drainage problem. That responsibility rests squarely upon PBS. Moreover, Burnham was entitled to the money damages for which it counterclaimed.

Decree reversed. Case remanded for the entry of a final decree consistent with this opinion. Jurisidiction relinquished.