Mandy MORNINGSTAR, Appellee

v.

Sue A. HALLETT, Appellant.

Superior Court of Pennsylvania.

Argued Nov. 19, 2003.

Filed Aug. 27, 2004.

Michael J. Krout, York, for appellant.

Stephen D. Kulla, Waynesboro, for appellee.

Before: TODD, BENDER, and BECK, JJ.

OPINION BY TODD, J.:

¶ 1 Sue A. Hallett appeals the March 19, 2003 order of the Franklin County Court of Common Pleas granting summary judgment in favor of Mandy Morningstar in the amount of $10,205.85. She also challenges the court's prior August 22, 2002 order precluding her counterclaims.[1] We reverse.

¶ 2 The relevant facts of the instant case were summarized by the trial court as follows in its opinion in support of its order granting summary judgment:

> In August, 1999, Plaintiff Mandy Morningstar (hereinafter "Morningstar") placed an advertisement in the *York Daily Record* for the sale or lease of a horse that she owned, named Glissen Rhode to Pleasure (hereinafter "the horse"). Defendant Sue A. Hallett (hereinafter "Hallett") saw the advertisement and contacted Morningstar to inquire about the horse. The *York Daily Record* advertisement in its entirety is as follows:
>
> SALE OR LEASE
>
> Retired eventer. Lovely 11 year old thoroughbred mare. Flashy bay, 16 +

---

1. Although this order was not specified in her notice of appeal, we note that a notice of appeal from the entry of judgment will be viewed as drawing into question any prior non-final orders that produced the judgment. *See K.H. and D.A.H v. J.R. and N.R.*, 573 Pa. 481, 494, 826 A.2d 863, 871 (2003).

hands, extension jumping & dressage, superb mover, perfect horse for any level rider. Reasonable offer considered to right home. Call [seller's phone number].

On August 18, 1999, Hallett made her first visit to examine and ride the horse at Morningstar's farm on Mentzer Gap Road where the horse was boarded. Hallett's mother, Eleanor Virginia Hallett, and an acquaintance named Jennifer Titemore, an experienced horse-rider, accompanied Hallett to Morningstar's farm. Hallett invited Jennifer Titemore to accompany her so that Hallett could observe and evaluate how the horse moved through [its] gaits under the direction of another rider, rather than make all determinations about the horse while Hallett, herself, was riding the horse. Hallett had taken her own saddle along with her to Morningstar's farm, and she and Morningstar retrieved the horse from its stall and put a bridle and Hallett's saddle on the horse. Hallett proceeded to mount the horse and walk and trot it in a small ring behind the barn where the horse had been stabled. Hallett stated that she didn't notice anything wrong with the horse as it walked, but noticed the horse was lame when she trotted it. Hallett later went to the farm again for the purpose of examining the horse a second time.

On September 2, 1999, Morningstar and Hallett entered into a contract by signing a written Sales Agreement whereby both parties covenanted that Hallett was buying the horse from Morningstar for the sum of $2,950.00. The signed Sales Agreement in its entirety is as follows:

## SALES AGREEMENT

I, Mandy Morningstar in consideration of two thousand nine hundred fifty dollars ($2,950.00), hereby paid to me by Sue Hallette (sic), sell to Sue Hallette (sic) the following horse: "Glissen" Rhode to Pleasure.

Age: 11 years     Color: Bay
Breed: Thoroughbred     Sex: Female
Height: 16+ hands     Tattoo#: R050

I hereby covenant that I am the lawful owner of said horse, that I have the right to sell the horse, and that I will warrant and defend said horse against claims and demands of all persons. There are no other warranties expressed or implied including fitness for certain purposes. **The buyer is buying horse as is.** (Emphasis added.) The risk of the horse's death or injury passes to the buyer as soon as the buyer takes possession of the horse. The seller has right to refuse refund for any reason. The seller may recover any and all legal fees if it becomes necessary. The seller is not liable for injury or death of a participant resulting from the inherent risk of equine activities. Said horse has been exposed to stallion and if resulting exposure produces a foal, the foal remains the property of seller. Executed this second day of September, 1999.

SELLER:     BUYER:
(Signature and address    (Signature and address
of Mandy Morningstar)    Sue Hallett)

A short time after Hallett had tendered her check to Morningstar for the sum of $2,950.00 and had taken possession of the horse, Hallett contacted her bank and authorized a stop payment order on the check and attempted to return the horse to Morningstar. Morningstar refused return of the horse and filed a Complaint in Breach of Contract against Hallett.

(Trial Court Opinion, 1/22/02, at 3–5.)

¶ 3 On February 29, 2000, a district justice ruled in favor of Morningstar on her

claim against Hallett for breach of contract. Hallett appealed the judgment to a panel of arbitrators, which, on April 26, 2000, awarded to Morningstar judgment in the amount of $6,277.03, plus attorneys' fees. On May 10, 2000, Morningstar filed a complaint against Hallett alleging breach of contract. On June 26, 2000, Hallett filed an answer with new matter and counterclaim, raising claims of fraud, misrepresentation, unfair trade practices, and mutual mistake. Hallett averred that the actual age of the horse was 16 years, and that the horse's condition, including eyesight problems and a heart murmur, rendered it incapable of significant jumping or dressage.

¶ 4 On July 23, 2002, Hallett filed a motion *in limine* wherein she indicated her intention to introduce at trial, *inter alia*, the newspaper advertisement placed by Morningstar and evidence of the discussions between the parties prior to Hallett's purchase of the horse. Hallett also indicated her intention to offer the testimony of veterinarian Anne Moretta. Morningstar filed an answer to Hallett's motion, and on August 22, 2002, the trial court issued an order holding that "[d]ue to the unambiguous 'as is' language in the contract as well as the 'right to refuse refund' language, [Hallett] will not be permitted to proceed on the basis of fraud, misrepresentation, unfair trade practices or mistake claims." (Order, 8/22/02.) The trial court further indicated that "[t]he proposed testimony of Dr. Anne Moretta will not be permitted since her examination occurred after the date of entry into the contract." (*Id.*)

¶ 5 Thereafter, on August 28, 2002, Morningstar filed a motion for summary judgment on the grounds that Hallett was unable to establish a *prima facie* case that Morningstar breached her contract in view of the fact that the contract stated that the horse was being sold "as is" and Morningstar had, in fact, delivered the horse to Hallett. On January 22, 2003, the trial court granted Morningstar's motion for summary judgment and attorneys' fees. On March 20, 2003, judgment was entered in favor of Morningstar in the amount of $10,205.85. In this appeal of the trial court's grant of summary judgment, Hallett raises the following issues:

I. Whether [Hallett] provided a sufficient offer of proof in order to present her claims of fraud, misrepresentation, unfair trade practices and mistake.

II. Whether [Hallett's] expert witness should have been permitted to provide testimony and evidence.

III. Whether summary judgment should have been granted in favor of [Morningstar] where proof of performance in compliance with the contract was supported only by [Morningstar's] testimony.

IV. Whether material issues of fact existed to preclude the granting of summary judgment?

(Appellant's Brief at 2.)

¶ 6 We first will consider whether the trial court erred in granting summary judgment in favor of Morningstar with respect to her breach of contract action against Hallett. Summary judgment properly is granted after the close of the relevant pleadings "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report" and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035.2(1). The standard of our review of an order granting or denying a motion for summary judgment pursuant to Rule 1035.2 is well established. In reviewing an order granting summary judgment, an appellate court must examine the record in the light most

favorable to the non-moving party. *Curbee, Ltd. v. Rhubart*, 406 Pa.Super. 505, 508–09, 594 A.2d 733, 735 (1991); *Laventhol & Horwath v. Dependable Ins. Assoc., Inc.*, 396 Pa.Super. 553, 558, 579 A.2d 388, 390 (1990). We will reverse only if there has been an error of law or a clear abuse of discretion. *Hetrick v. Apollo Gas Co.*, 415 Pa.Super. 189, 194, 608 A.2d 1074, 1077 (1992).

■ ¶ 7 In her complaint against Hallett, Morningstar argued that, pursuant to the sales agreement signed by the parties, Morningstar was required to deliver to Hallett the horse that Hallett rode and agreed to purchase for $2,950. Morningstar argued that by delivering the horse to Hallett, she complied with the terms of the contract, and that Hallett, by refusing to pay for the horse, breached the contract. Hallett, however, contends that under the contract, Morningstar was required to provide "the specific horse of the exact age noted in the Sales Agreement," (Appellant's Brief at 10), and that Morningstar breached the contract by failing to do so. The trial court concluded that there was no genuine issue of material fact because:

> [a]t no time did Hallett have the single-minded intent to set out to find and purchase a particular, certifiable eleven-year-old horse specifically identified through registration papers, reputation, or otherwise as "Glissen Rhode to Pleasure." Rather, Hallett intended to purchase for $2,950.00 the horse that she rode and examined at Morningstar's farm, and the contract reflects Hallett's intent.

(Trial Court Opinion, 1/22/03, at 7–8.)

■ ¶ 8 As this Court previously has explained:

> The paramount goal of contractual interpretation is to ascertain and give effect to the intent of the parties. In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.

*PBS Coals, Inc. v. Burnham Coal Co.*, 384 Pa.Super. 323, 328, 558 A.2d 562, 564 (1989) (citations omitted). The sales agreement specifically stated that the horse being purchased was 11 years old.

¶ 9 With respect to the effect of the "as is" language contained in the sales agreement, Section 2316(b) and (c) of Pennsylvania's Uniform Commercial Code ("UCC") provide as follows:

> (b) Implied warranties of merchantability and fitness.—Subject to subsection (c), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "there are no warranties which extend beyond the description on the face hereof."

> (c) Implied warranties in general.—Notwithstanding subsection (b):

> (1) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the attention of the buyer to the exclusion of warranties and makes plain that there is no implied warranty.

> (2) When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination

ought in the circumstances to have revealed to him.

(3) An implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

13 Pa.C.S.A. § 2316(b) and (c).

¶ 10 Thus, the "as is" clause contained in the sales agreement made plain that there were no *implied* warranties with respect to the horse, and by signing the sales agreement which contained the "as is" clause, Hallett agreed to purchase the horse *in the condition* in which she found it. *See PBS Coals, Inc.*, 384 Pa.Super. at 328, 558 A.2d at 564 (when something is accepted "as is" the buyer is put on notice that there may be liabilities attendant to the purchase and the warranties which may otherwise be implied by law do not attach when the buyer agrees to accept the goods in the condition in which they are found).

¶ 11 However, as our Supreme Court explained in *Industrial Rayon Corp. v. Clifton Yarn Mills, Inc.*, 310 Pa. 322, 165 A. 385 (1933):

> In *W.E. Hedger Co., Inc., v. United States* (D.C.) 42 F.2d 553, 554, it is said that, *where the identity of articles sold is fixed, the 'as is, where is' of the bill of sale refers only to the condition of the article*. The court there relied on *Shep-*

*herd v. Caine*, 5 Barn. & Ald. 240, where the sale of an article was 'with all faults,' and it was held that this means *all faults consistently with its being the thing described*.

*Id.* at 328, 165 A. at 387 (emphasis added). Here, the horse was described in the sales agreement, *inter alia*, as being 11 years old.

¶ 12 We further note that Section 2316(c)(1) of the UCC pertains to disclaimers of *implied* warranties. Pursuant to Section 2313, "[a]ny description of the goods which is made part of the basis of the bargain creates an *express warranty* that the goods shall conform to the description." 13 Pa.C.S.A. § 2313(a)(2) (emphasis added). Once again, we note that the sales agreement specifically indicated that the horse being sold to Hallett was 11 years old, thereby creating an express warranty.[2] Thus, the "as is" clause was insufficient to disclaim the express warranty that the horse was 11 years old.

¶ 13 Moreover, under Section 2316(a),

> [w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this division on parol or extrinsic evidence

---

**2.** To the extent the trial court opines that the age of the horse was not part of the basis of the bargain, we cannot agree. In *Sessa v. Riegle*, 427 F.Supp. 760 (E.D.Pa.1977), the court explained that the issue of whether an express warranty is a part of the basis of the bargain is

> inextricably intertwined with the initial determination as to whether given language may constitute an express warranty since affirmations, promises and descriptions tend to become part of the basis of the bargain. It was the intention of the drafters of the [Uniform Commercial Code] not to require a strong showing of reliance. In

fact, they envisioned that all statements of the seller became part of the basis of the bargain unless clear affirmative proof is shown to the contrary.

*Id.* at 766 (citing Official Comments 2 and 8 to Uniform Commercial Code § 2–213, 12A P.S. § 2–213 (now 13 Pa.C.S.A. § 2313)). Based on our review of the trial court's opinion in support of its grant of summary judgment in favor of Morningstar, we note that the trial court's conclusion is not based on any affirmative proof that would suggest that Morningstar's representation that the horse was 11 years old was not a part of the basis of the bargain.

(section 2202) negation or limitation is inoperative to the extent that such construction is unreasonable.

13 Pa.C.S.A. § 2316(a). This section "seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty." *Id.* cmt. Thus, to the extent the trial court relied on the "as is" clause in finding that Morningstar did not breach the contract by failing to deliver to Hallett an 11–year–old horse, we conclude that the "as is" clause is inconsistent with the express warranty created by the description of the horse as provided in the sales agreement and hold that the "as is" language contained in the sales agreement is insufficient to disclaim the express warranty that the horse was 11 years old.

▆ ¶ 14 Furthermore, to the extent the trial court also relied on the language of the sales agreement which indicated that the seller had the right to refuse a refund for any reason, we conclude that this language also is insufficient to serve as a disclaimer to the express warranty created by the description of the horse as 11 years old. Rather, we find that this provision is more appropriately viewed as a contractual modification or limitation of remedy under Section 2719 of the UCC. Accordingly, for the foregoing reasons, we conclude that there is a material question of fact as to whether Morningstar breached her agreement with Hallett, and that summary judgment therefore was inappropriate in the instant case.[3]

▆ ¶ 15 We must next consider whether the trial court erred in refusing to allow Hallett to proceed on her claims of fraud, misrepresentation, unfair trade practices, and mistake. The trial court held "[d]ue

to the unambiguous 'as is' language in the contract as well as the 'right to refuse refund' language, [Hallett] will not be permitted to proceed on the basis of fraud, misrepresentation, unfair trade practices or mistake claims." (Trial Court Order, 1/22/02.) However, in *Industrial Rayon Corp., supra,* our Supreme Court approved a trial judge's charge wherein he advised the jury that it could render a verdict for the buyer despite an "as is" clause if they found that the seller had misrepresented the origin of the goods and that the buyer had relied on this misrepresentation. Thus, the "as is" language contained in the sales agreement does not necessarily preclude an action by Hallett for fraud, misrepresentation, deceptive trade practices, or mistake. Accordingly, we conclude that the trial court erred in precluding Hallett from proceeding on her claims solely on the basis of the "as is" clause. We do not, however, express any opinion as to whether Hallett otherwise can sufficiently establish a *prima facie* case in this regard.

▆ ¶ 16 Finally, because Hallett may seek to proceed on her various fraud claims on remand, we will address her claim that the trial court erred in denying her the opportunity to present expert evidence and testimony. The trial court held:

> The proposed testimony of Dr. Anne Moretta will not be permitted since her examination occurred after the date of entry into the contract. This ruling is made after a review of the cited case law and a determination that both parties are knowledgeable about the subject matter, any alleged defects were reasonably discoverable and the language of the contract is unambiguous.

(Trial Court Order, 8/22/02.) Neither the trial court nor Morningstar provide any

**3.** Significantly, the trial court did not conclude that the horse was, in fact, eleven years

old, but simply held that the age of the horse was not part of the basis of the bargain.

support for the proposition that Dr. Moretta's testimony is precluded because she made an examination after the date of the entry of the contract, and we are aware of none. Indeed, such testimony is directly relevant to Hallett's claim; accordingly, we hold that Hallett should be permitted to introduce Dr. Moretta's expert testimony to the extent it supports Hallett's claims regarding Morningstar's failure to deliver a horse of the age specified in the sales agreement.

¶ 17 For the reasons set forth above, we hold that the trial court erred in granting summary judgment in favor of Morningstar, and, accordingly, reverse the March 19, 2003 order. In addition, we reverse the trial court's August 22, 2002 order precluding Hallett from proceeding with her counterclaims of fraud, misrepresentation, deceptive trade practices, and mutual mistake.

¶ 18 Order of August 22, 2002 REVERSED and order of March 19, 2003 granting summary judgment REVERSED. Case REMANDED. Jurisdiction RELINQUISHED.