**The JUNIATA VALLEY BANK**

v.

**MARTIN OIL COMPANY**

v.

**Angela T. Dalton, Zeigler & Weizer Real Estate Partnership, Herbert Weizer and Edgar K. Ziegler.**

**Appeal of Martin Oil Company (at 1138).**

**The Juniata Valley Bank, Appellant (at 2),**

v.

**Martin Oil Company**

v.

**Angela T. Dalton, Zeigler & Weizer Real Estate Partnership, Herbert Weizer and Edgar K. Ziegler, Appellees.**

Superior Court of Pennsylvania.

Argued Dec. 16, 1998.
Filed Aug. 4, 1999.

Mark D. Bradshaw, Harrisburg, for Martin Oil Co.

Robyn K. Bowman, Harrisburg, for Juniata Valley Bank.

Before POPOVICH, SCHILLER and OLSZEWSKI, JJ.

POPOVICH, J.

¶ 1 In this action, Juniata Valley Bank advanced claims of misrepresentation, negligence, trespass, nuisance and violation of the Storage Tank Spill Prevention Act ("STSPA"), 35 P.S. § 6021, against Martin Oil Company ("Martin Oil") in an effort to recover costs it has and will incur due to the presence of an underground storage tank and the discharge of fuel oil on one of its properties. The trial court granted the bank relief on its STSPA claim. Upon review, we vacate the final decree, reverse the entry of summary judgment in favor of the bank, affirm the denial of Martin Oil's motion for summary judgment and remand for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

¶ 2 On December 24, 1996, Juniata Valley Bank filed a motion for partial summary judgment with respect to Martin Oil's liability under the STSPA. In response, Martin Oil filed a cross-motion for summary judgment as to all claims. The court of common pleas granted partial summary judgment in favor of Juniata Valley Bank. Martin Oil Company then requested certification of the case for im-

mediate interlocutory review, which the trial court denied.[1]

¶ 3 Instead, the trial court held a bench trial limited to the issue of damages, and, on October 20, 1997, entered a final decree which required Martin Oil to pay costs of abatement in the amount of $182,253.07. Additionally, the court awarded Juniata Valley Bank sixty percent of its attorneys' fees. Both parties filed motions for post-trial relief, which were denied, and Martin Oil's timely appeal and Juniata Valley Bank's cross-appeal followed.

*SCOPE AND STANDARD OF REVIEW*

¶ 4 Our scope of review of a grant or denial of summary judgment is plenary, and we apply the same standard of review that the trial court employs. *See Cunningham v. McWilliams*, 714 A.2d 1054, 1056 (Pa.Super.1998), *appeal denied*, —— Pa. ——, 734 A.2d 861, 1999 Pa. Lexis 40 (Pa.1/12/99). That is, we view the record in the light most favorable to the non-moving party and resolve all doubts as to the existence of a genuine issue of material fact in its favor. *See id.* Summary judgment is appropriate if the moving party is entitled to judgment as a matter of law and there is no genuine issue of any material fact as to a necessary element of the cause of action or defense. *See* Pa. R.Civ.P. 1035.2. Since this is an equity matter, our review is limited to a determination of whether there has been an abuse of discretion or an error of law, and we will not disturb the final decree unless it is unsupported by the evidence or demonstrably capricious. *See Soderberg v. Weisel*, 455 Pa.Super. 158, 687 A.2d 839, 842 (1997).

*FACTUAL BACKGROUND*

¶ 5 The subject of this dispute is a property located on Route 32 in Milroy, Pennsylvania ("the Milroy property"). Martin Oil leased this property from 1981 through

1986 and then purchased it in December of 1986 from Angela Dalton. At the time of purchase, Martin Oil was aware that since at least 1950, its predecessors had operated a gasoline service station there and that a number of abandoned underground storage tanks remained on the Milroy property. Throughout its occupancy, Martin Oil continued to run the service station and stored the petroleum products for its operations in four of several previously installed underground storage tanks. Martin Oil vacated the property on August 10, 1989.

¶ 6 In November of 1989, Martin Oil entered negotiations for the sale of the premises with the Zeigler–Weiser Real Estate Partnership ("the partnership"). During the negotiations, Martin Oil informed the partnership that both it and the predecessor owners had operated a gasoline service station on the premises. The partnership subsequently sought financing for the purchase of the property from Juniata Valley Bank. The bank agreed to extend a $120,000 mortgage to the partnership.[2] The bank's branch manager, Randy French, testified in his deposition that he instructed the partnership to obtain indemnity from Martin Oil for any liability that might arise from the prior storage of gasoline and petroleum products at the site.

¶ 7 Originally, the partnership requested the inclusion of an indemnification provision in the contract of sale, but Martin Oil adamantly refused and asserted it would only sell the property on an "as is" basis. As a result of the parties' negotiations, the contact of sale included an addendum, which stated:

All underground tanks from the Milroy property were removed from the property on November 22, 1989. Martin Oil Company purchased said property on December 22, 1986 from Angela T. Dalton. During the period beginning De-

---

1. The trial court denied an identical motion after it rejected Martin Oil's request for judgment on the pleadings.

2. Additionally, Martin Oil extended a second mortgage in the amount of $ 40,000.

cember 22, 1986 and the date the tanks were removed, November 22, 1989, Martin Oil Company records confirm that tanks in use showed no loss of petroleum product. Inasmuch as all tanks have been removed, the sale of the building and real estate is on an "as is" basis. Martin Oil Company makes no warranty of any kind.

Addendum to the Agreement of Sale, 1/5/90, at 1.

¶ 8 Closing took place on February 2, 1990. A representative from Juniata Valley Bank attended the closing. Like the agreement of sale, the deed included a provision which stated, "The premises are conveyed in an 'as is' condition." At closing, the bank's representative did not review the agreement of sale or deed.

¶ 9 The partnership operated an automobile dealership on the Milroy property until it filed for bankruptcy. Juniata Valley Bank instituted foreclosure proceedings on January 8, 1991, and later purchased the property at sheriff's sale. In June of 1992, the bank received an expression of interest in the Milroy property. However, the prospective buyer refused to purchase it absent assurances of environmental soundness.

¶ 10 Pursuant to this request, the bank hired consultants to conduct a preliminary environmental assessment. This assessment revealed the presence of petroleum hydrocarbon contamination in both the soil and groundwater. In January of 1993, the bank hired a second group of consultants to perform a more extensive assessment. Upon completion of the second assessment, the consultants advised the bank to complete soil and groundwater remediation, which would eliminate the high levels of hydrocarbon contamination detected at the site.[3]

¶ 11 GeoServices, Ltd. ("GeoServices") commenced remediation on July 1, 1996, and discovered corroded, tank-related pipes and dissolved petroleum product when it excavated one of the contaminated soil areas. Approximately one week later, GeoServices uncovered an underground storage tank filled with water, a related network of pipes and more dissolved petroleum product. The tank was heavily corroded and had holes in its sidewalls and bottom. The pipes were in equally poor condition.

## DISCUSSION

¶ 12 On appeal, Martin Oil presents two arguments. It first argues that the trial court erred in granting summary judgment in favor of Juniata Valley Bank when the bank lacked standing to recover under the STSPA. Second, Martin Oil argues that the trial court erroneously denied its motion for summary judgment, which was based upon the bank's status as a foreclosure purchaser and the agreement of sale between the partnership and Martin Oil. In its cross-appeal, Juniata Valley Bank challenges the amount of damages and attorneys' fees awarded by the trial court.

## Liability of Prior Owners Under the STSPA

¶ 13 We first consider whether the trial court properly granted partial summary judgment in favor of Juniata Valley Bank with respect to Martin Oil's liability under the STSPA. Both parties frame the primary issue as one of standing. Martin Oil asserts that neither the express language of the STSPA nor relevant case law permits a successor owner of a property to recover damages from a former owner. In addition, Martin Oil contends that the bank, as current owner of the property, is the party liable for the costs of cleanup under the STSPA. Juniata Valley Bank, on the other hand, argues that the STSPA

---

**3.** Before its commencement of the present action, Juniata Valley Bank notified Martin Oil, the Department of Environmental Resources and the United States Environmental Protection Agency of the suspected release of petroleum product. *See* 35 P.S. § 6021.1305(d) (requiring plaintiff to provide written notice of STSPA violation to department and alleged violator at least sixty days prior to commencement of private action).

imposes no limitations on standing and that judicially imposed restrictions on standing would be inconsistent with both the language and purpose of the STSPA. The bank further claims that Martin Oil is strictly liable under the STSPA, be it as an "operator" or an "owner" of an underground storage tank.

■ ¶ 14 The principles set forth in the Statutory Construction Act, 1 Pa. C.S.A. §§ 1501–1991, guide our resolution of this issue.

> The object of all statutory interpretation is to ascertain and effectuate the intention of the General Assembly. While the object of statutory interpretation is ascertaining and effectuating the intention of the General Assembly, every statute shall be construed to give effect to all of its provisions. Notwithstanding, when the words of the statute are clear and free from all ambiguity, we will not disregard the letter of the law under the pretext of pursuing its spirit.

*Centolanza v. Lehigh Valley Dairies, Inc.*, 540 Pa. 398, 404–05, 658 A.2d 336, 339 (1995) (citations omitted), *rehearing denied*, 1995 Pa. Lexis 515 (Pa.7/13/95).

¶ 15 Both Juniata Valley Bank and Martin Oil seize upon our supreme court's holding in *Centolanza* to support their arguments on appeal. In *Centolanza*, our supreme court held that a private citizen could maintain an action against a neighboring property owner under the STSPA for future costs of contamination cleanup and diminution in the value of his property. The *Centolanza* court construed the STSPA broadly and determined that such a plaintiff was entitled to invoke the same presumption of liability available to the Department of Environmental Resources. The *Centolanza* holding, however, does not address the issues presented in this case, namely, whether a current owner may sue a prior owner under the act, and, if so, whether the current owner may invoke the presumption of liability.

■ ¶ 16 Initially, we find Martin Oil's challenge to the bank's standing unpersuasive. The language that establishes a private cause of action under the STSPA is broad and inclusive:

> ... [A]ny person having an interest which is or may be affected may commence a civil action on his behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act by any owner, operator, landowner or occupier alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act.

35 P.S. § 6021.1305(c). This section contains few limitations as to who may sue to compel compliance and recover response costs under the act, and the remainder of the act contains no additional limitations as to standing. In the present case, Juniata Valley Bank's standing derives from its ownership of the Milroy property, a property allegedly contaminated with petroleum products due to Martin Oil's failure to comply with the STSPA. Clearly, the bank has an interest which may be affected by the alleged violations of the STSPA, and, therefore, has standing to initiate this suit.

■ ¶ 17 While we can readily conclude that the bank may maintain its action under the STSPA, it is far less certain that the bank may invoke the presumption of liability against a prior owner or operator of the Milroy property. The structure of section 1311, which addresses the presumption, is not a model of statutory clarity. *See Centolanza*, 540 Pa. at 406–07, 658 A.2d at 340. Nonetheless, we find the bank's contention that Martin Oil is *presumed liable* for the contamination on the Milroy property inconsistent with the express terms of the statute. Section 103 of the act contains the following definitions:
> **"Operator."**
> Any person who manages, supervises, alters, controls or has responsibility for the operation of a storage tank.
> **"Owner."**

(1) In the case of a storage tank in use on the effective date of this act, or brought into use after that date, any person who owns or has an ownership interest in a storage tank used for the storage, containment, use or dispensing of regulated substances....

(3) In the case of an underground storage tank, the owner of an underground storage tank holding regulated substances on or after November 8, 1984, and the owner of an underground storage tank at the time all regulated substances were removed when removal occurred prior to November 8, 1984.

35 P.S. § 6021.103 (Definitions). The statutory definition of owner includes both past and present owners, and private citizens may maintain an action against "any owner, operator, landowner or occupier" for "any violation of any provision of [the] act." *See* 35 P.S. § 6021.1305.

¶ 18 In contrast, a significantly narrower class of defendants may be held to the presumption of liability:

(a) **General Rule.**—Except as provided in subsection (b), it shall be presumed as a rebuttable presumption of law in civil and administrative proceedings that *a person who owns or operates an* aboveground or *underground storage tank shall be liable, without proof of fault, negligence, or causation,* for all damages, contamination or pollution within 2,500 feet of the perimeter of the site of a storage tank containing or which contained a regulated substance of the type which caused the damage, contamination or pollution. Such presumption may be overcome by clear and convincing evidence that the person so charged did not contribute to the damage, contamination or pollution.

35 P.S. § 6021.1311(a) (emphasis added). Section 1311 does not impose a presumption of liability against any "owner" or "operator," but limits the application of the statutory presumption to "a person who owns or operates" a storage tank. The legislature's use of the present tense con-

notes that the presumption applies only to *current* owners and operators of storage tanks. To hold otherwise would be to ignore the linguistic differences in sections 1305 and 1311 and to endorse an interpretation of the STSPA that ignores the express language of section 1311, which this court has no authority to do. *See Commonwealth v. Lopez,* 444 Pa.Super. 206, 663 A.2d 746, 748 (1995) ("When construing one section of a statute, courts must read that section not by itself, but with reference to, and in light of, the other sections."); *see also Turner v. May Corp.,* 285 Pa.Super. 241, 427 A.2d 203, 207 (1981) ("[R]ules of statutory construction provide that when statutes or parts of statutes relate to the same persons or things or to the same class of person or things, they are in *pari materia* and should be 'construed together[.]' ")

¶ 19 In the present case, Martin Oil owned the Milroy property and the tanks upon it "on or after 1984," and, thus, falls within the definition of "owner," but it does not currently own or operate the underground storage tanks at issue. Hence, Juniata Valley Bank was not entitled to invoke the presumption of liability against Martin Oil. Absent the statutory presumption, the burden was on the bank to demonstrate that Martin Oil's alleged violations of the STSPA caused the contamination on the property. *See* 35 P.S. § 6021.1304 ("Any person who *causes* such public nuisance shall be liable for the cost of abatement." (emphasis added)); *see also Fleck v. Timmons,* 374 Pa.Super. 417, 543 A.2d 148, 152–54 (1988) (holding that owners of well which became polluted were not entitled to invoke presumption of liability and recover under the Solid Waste Management Act from neighboring landowners who had pumped kerosene into underground storage tanks; owners were precluded from recovery unless they presented evidence that act of pumping kerosene into the tanks caused their wellwater to

become polluted with weathered gasoline).[4]

¶ 20 We cannot determine from the record whether Martin Oil, through its operations or excavation activities, caused the contamination on the Milroy property. There is evidence of record that suggests that Martin Oil, through its operation of a gasoline service station and its excavation activities, may have caused some of the contamination on the property. Two Martin Oil employees testified in their depositions that some spillage occurred during their excavation efforts. The bank also presented evidence that Martin Oil failed to remove one underground storage tank as well as underground piping from the site when it conducted its excavation of the storage tanks. Additionally, the environmental assessments revealed at least four separate areas on the Milroy property that were contaminated by petroleum product.

¶ 21 However, there also exists evidence that indicates Martin Oil may not have caused the contamination on the Milroy property. The same depositions relied on by the bank reveal that Martin Oil took measures to contain and absorb the spilled petroleum product and also removed the surrounding soil from the site. Further, the bank presented no evidence that Martin Oil knew of the existence of the subsequently discovered storage tank and piping network, utilized them in its operations or attempted to remove them during the excavation. Finally, we note that since 1950, several different individuals utilized the underground storage tanks installed on the Milroy property, and it is possible that their operations may have contributed to the contamination, especially when we consider the age and condition of the discovered tank. In sum, material issues of fact exist as to whether and to what extent Martin Oil caused the contamination on the Milroy property.

¶ 22 The trial court neither discussed nor considered the element of causation when it rendered its decision. It only determined that Martin Oil was liable for *all* of the contamination on the property because its excavation activities violated section 502(c) of the act.[5] Likewise, neither party presented arguments on this issue to the trial court. Without a lower court's consideration of the issue and the assistance of briefs by opposing counsel, it would be inadvisable for this Court to consider the issue *sua sponte*. *See Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 257–60, 322 A.2d 114, 116–17 (1974). We therefore vacate the entry of partial summary judgment in favor of Juniata Valley Bank and remand this matter to the trial court for further consideration.

### Martin Oil's "As Is" Defense

¶ 23 We turn now to Martin Oil's second claim, which is that the trial court erred in

---

4. In essence, appellee's position would convert the STSPA into an insurance scheme for financial institutions, protecting them against possible losses due to the extension of mortgages secured by contaminated properties. At foreclosure sales, mortgagees could acquire contaminated properties cheaply, and all former owners and operators would face potential STSPA liability. Once cleaned at their expense, the mortgagee-turned-owner would then be in a position to sell the site at a substantial profit. Prior owners would be forced to shoulder the costs of cleanup, while the former mortgagee-turned-owner would enjoy the benefits derived from the increased value of the property after cleanup. *Cf., U.S. v. Maryland Bank & Trust Co.*, 632 F.Supp. 573, 580 (D.Md.1986) (addressing whether CERCLA requires a bank, which formerly held a mortgage on a parcel of land, later purchased the land at a foreclosure sale and continues to own it, to reimburse the United States for the costs of cleaning up hazardous wastes on the land when those wastes were dumped prior to the bank's purchase of the property).

5. Section 502(c) provides,

    **Discontinued use.**—Upon abandonment or discontinuance of the use or active operation of an underground storage tank, the owner and operator shall remove the tank and its contents or shall seal the tank, and restore the area in a manner that prevents any future release, and shall remedy any adverse impacts from any prior release in a manner deemed satisfactory to the department.

    35 P.S. § 6021.502(c).

denying its motion for summary judgment. Martin Oil's motion for summary judgment rested upon the following defense: As a sheriff's sale purchaser, the bank acceded to all right, title and interest possessed by the partnership. Since conveyance to the partnership took place on an "as is" basis, the partnership effectively released Martin Oil from liability for any environmental contamination on the Milroy property. Martin Oil concludes that, as a matter of law, the bank is not entitled to relief because, as a foreclosure purchaser, it took the property subject to the partnership's waiver of any environmental claims against the seller.

¶ 24 Juniata Valley Bank counter-argues that Martin Oil cannot evade liability under the STSPA, and even if it were possible for Martin Oil to disclaim environmental liability, the purchase agreement failed to do so in express terms. Further, the bank argues that since it was not a party to the agreement or deed of sale, it is not bound by the terms therein. Alternatively, the bank argues that the "as is" clauses ought not be enforced because Martin Oil deliberately eschewed information within its control that would have revealed the property's true environmental condition.[6]

¶ 25 Even if we assume, *arguendo,* Martin Oil could relieve itself from environmental liability by contract, its argument must fail nevertheless. We reject Martin Oil's argument that the bank, as a foreclosure purchaser, stepped into the shoes of the partnership and therefore cannot raise any claims previously waived by the partnership. The record simply does not support a finding that, as a matter of law, the bank took possession of the Milroy property subject to the partnership's waiver of claims against Martin Oil. Therefore, Martin Oil was not entitled to summary judgment.

¶ 26 It is true, as Martin Oil points out, that a foreclosure purchaser steps into the shoes of the prior owner and acquires only such rights in the property as possessed by the judgment debtor:

A Sheriff's Sale is made without warranty; the purchaser takes all the risk, and the rule of *caveat emptor* applies in all its force. The purchaser at such a sale receives all the right, title, and interest in the property that the judgment debtor held and the rights of the purchaser become fixed when the property is knocked down to the highest bidder. If the debtor had no rights in the property at the time of the sheriff's sale, however, no title passes to the purchaser.

*CSS Corp. v. Sheriff of Chester County,* 352 Pa.Super. 256, 507 A.2d 870, 872 (1986) (citations and footnote omitted), *allocatur denied,* 514 Pa. 630, 522 A.2d 559 (1987). This principle, however, relates to the quality of title held by the foreclosure purchaser and applies in those cases where the absence of particular warranties of title precludes the purchaser from complaining of a defect in title. Traditionally, six warranties protect the purchaser against defects in the quality of title. *See, e.g., Dobbins v. Brown,* 12 Pa. 75, 79 (1849); *see also* 20 Am.Jur. 2d *Covenants of Title* §§ 46–52. Three are breached, if at all, at the time of conveyance: the covenant of seisin, the covenant of the right to convey

---

6. The trial court addressed only Martin Oil's defense as it related to the bank's STSPA claim. It found that the "as is" provisions did not preclude the bank from relief because Martin Oil misrepresented that all tanks had been removed from the property. In the alternative, the trial court found that the "as is" provisions should not be enforced because of a mutual mistake of fact; specifically, that at the time of transfer no underground storage tanks remained on the property.

This court is uncertain as to the basis for the trial court's findings of misrepresentation and mutual mistake. In its Rule 1925(b) opinion, the trial court neither addressed Martin Oil's arguments based on the doctrine of merger and the integration clause in the agreement of sale, nor conducted a legal analysis of the issues of misrepresentation and mistake. Both parties presented evidence that, if believed by the factfinder, would support their respective positions on these issues. Hence, material facts are in dispute.

and the covenant against encumbrances. The three remaining covenants, those of warranty, quiet enjoyment and further assurances, are breached, if at all, after the closing.[7]

¶ 27 All of the cases cited by Martin Oil in support of its argument concern the quality of title conveyed at a foreclosure sale. For example, the *CSS* case involved an encumbrance on the title of a lot purchased at sheriff's sale. This court held that when the vendee purchased the lot, it acquired only those rights, title and interest in the property that the judgment debtor held. Accordingly, the vendee took title to the lot subject to a lien of a prior purchase money mortgage. *See CSS*, 507 A.2d at 872; *see also, National Penn Bank v. Shaffer*, 448 Pa.Super. 496, 672 A.2d 326, 329–30 (1996) (addressing covenant against encumbrances; holding that sheriff's sale would not be set aside even though purchaser miscalculated bid based on mistaken belief sale had legal effect of discharging mortgage); *DiCarlo v. Licini*, 156 Pa.Super. 363, 40 A.2d 127, 129–30 (1944) (addressing covenant of seisin and covenant of right to convey legal title when judgment creditor owns only a life estate in property; holding that regardless of the rights purportedly transferred to purchaser at judicial sale, legal title did not pass to purchaser because remainderman, not life tenant, possessed right to convey legal title).

¶ 28 In contrast, the quality of title is not at issue in the present dispute. Rather, Juniata Valley Bank seeks to enforce a statutory duty Martin Oil owes to the citizens of the Commonwealth to rectify any harm it caused to the environment because of an underground-storage-tank release. The viability of the bank's claim depends upon whether Martin Oil's acts caused the contamination on the property. Thus, the mere fact that the bank purchased the Milroy property at sheriff's sale will not preclude it from relief.[8]

7. Also referred to as "covenants of title," these warranties offer the following protections to the purchaser: The covenant of seisin is the grantor's promise that he owns the property interest he purports to convey to the grantee. The covenant of the right to convey is the grantor's promise that he has the power and authority to transfer the interest to the grantee. The covenant against encumbrances protects against the existence of physical or title encumbrances other than those acknowledged in the deed. Physical encumbrances include encroachments or easements. Title encumbrances include mortgages, leases, liens and unpaid property taxes. By the covenant of warranty, the grantor promises to compensate the grantee for any monetary losses occasioned by the grantor's failure to convey the title promised in the deed. There are three variations to the covenant of warranty, and property may be conveyed through a special warranty, general warranty or quitclaim deed. The covenant of quiet enjoyment is the grantor's promise that the grantee's possession will not be disturbed by any other claimant with a superior lawful title. Finally, the covenant of further assurances requires the seller to take affirmative steps to cure any defects in the grantor's title.

8. Martin Oil presents three ancillary arguments to support its assertion that Juniata Valley Bank took title to the Milroy property subject to the partnership's waiver of environmental claims against Martin Oil.

First, Martin Oil argues that the doctrine of merger prevents the bank from relying upon any representations contained in the contract of sale. The doctrine of merger "holds that all warranties and representations in connection with a sale or other transaction made prior to or contemporaneous with a deed are merged into the deed and that unless therein expressly provided for, they are forever lost." *Elderkin v. Gaster*, 447 Pa. 118, 123 n. 11, 288 A.2d 771, 774 n. 11 (1972). The doctrine of merger does not preclude the bank's claim because the claim rests upon Martin Oil's duty under the STSPA and not upon any representations made in the contract of sale.

Second, Martin Oil argues that the bank was a party to the agreement of sale and deed and therefore is bound by the terms of the contract. The bank is not deemed a party to the contract of sale and deed merely because it agreed to extend a mortgage to the partnership or because it advised the partnership to obtain indemnification for liabilities which might arise from the prior storage of gasoline and petroleum products at the site. Even if the bank were a party to the sale, we find, for reasons stated *infra*, that the provision in the agreement of sale which purports to relieve Martin Oil from liability is ambiguous.

¶ 29 Further, we reject Martin Oil's assertions that since conveyance to the partnership took place on an "as is" basis, the partnership effectively released Martin Oil from liability for any environmental contamination on the Milroy property. Martin Oil argues that the use of commonly understood terminology, such as "as is," enables a seller to shield himself effectively from *any* claims relating to the physical condition of the property, including claims of subsequent purchasers. Primarily, Martin Oil relies on this court's holding in *PBS Coals, Inc. v. Burnham Coal Co.*, 384 Pa.Super. 323, 558 A.2d 562 (1989), *appeal denied,* 524 Pa. 598, 568 A.2d 1248 (1989), to support its argument. We find that the "as is" provision is ambiguous and, therefore, we cannot conclude as a matter of law that the provision shielded Martin Oil from an STSPA claim brought by the original vendee—let alone by a subsequent owner of the property.

¶ 30 In *PBS Coals*, the purchaser of a strip mining property instituted an action in equity for a declaration that it was not responsible for environmental contamination that resulted from a mine drainage problem on its property. The buyer contended that the vendor was liable for the contamination because no specific language in the agreement of sale addressed the risk of loss for mine drainage problems. This court disagreed and found that the "as is" clause in the contract of sale gave the purchaser notice that the property may have defects, disclaimed any implied warranties and shifted the risk of loss unto the buyer. We reasoned that as sophisticated businessmen, the parties to the sale were presumed to be familiar with terms of common usage in business transactions. Moreover, the inclusion of the "as is" provision of the agreement of sale placed the purchaser on notice that there may be liabilities attendant to the purchase and that the warranties which might otherwise have been implied by law did not attach. Accordingly, we held that the "as is" language in the contract insulated the vendors from any liability for subsequently discovered mine drainage problems.

¶ 31 Although similar in some aspects, the present case is distinguishable from *PBS Coals*. Namely, equivocal language surrounds the term "as is" in the contract of sale and obscures its import. As noted in *PBS Coals*, our paramount goal in "contractual interpretation is to ascertain and give effect to the intent of the parties." *PBS Coals*, 558 A.2d at 564 (citations omitted). To determine the "intent of parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly." *Id.* (citation omitted).

¶ 32 In reaching its conclusion, the *PBS Coals* court emphasized that the "as is" clause in the agreement of sale was clear and unambiguous. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more that one sense. *See Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 200–02, 519 A.2d 385, 390 (1986). Whether an ambiguity in a contract exists is a question of law. *See id.* The contract provision Martin Oil relies upon is neither clear nor explicit, and it is for this reason that *PBS Coals* is inapposite to the case *sub judice. See id.*

¶ 33 The addendum to the contract of sale, when read in its entirety, is capable of being understood in more than one sense. On the one hand, certain portions of the "as is" provision indicate that the property is sold without warranty. The last sentence of the provision, for example, states that "Martin Oil makes no warranty

Third, Martin Oil argues that because the bank controlled the terms upon which the partnership bought the property, it cannot be heard to complain that the terms of the agreement are disadvantageous to it. We deem this argument waived since Martin Oil has failed to cite to a single authority which supports this position. *See* Pa. R.A.P. 2119; *see also McMichael v. McMichael,* 700 A.2d 1337, 1339 n. 6 (Pa.Super.1997).

of any kind." Furthermore, the addendum to the agreement of sale states that the purchase is on an "as is" basis. On the other hand, the equivocal language utilized in the addendum suggests 1) that the parties contemplated that all storage tanks had been removed from the property and 2) that Martin Oil had assumed responsibility for removal of all underground tanks on the property. In its interpretation of the contract of sale, Martin Oil ignores qualifications which precede the "as is" language and may operate to limit the scope of the provision. When read in full, the sentence reads, "Inasmuch as all tanks have been removed, the sale of the building and real estate is on an 'as is' basis." The addendum also contains a representation as to the current state of the property: it begins with the assertion that "all underground tanks from the Milroy property were removed."

¶ 34 Martin Oil insists that, under *PBS Coals*, "as is" *means* "as is." This may be true, but we cannot so readily conclude that "in so far as all tanks have been removed the property is sold on an 'as is' basis" *means* "as is." *See Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 476 A.2d 1, 5 (1984) (finding contracts ambiguous where language is capable of being understood in more senses than one, is obscure in meaning through indefiniteness of expression or has a double meaning). The ambiguity in the addendum to the contract of sale creates a genuine issue of material fact regarding whether the parties intended to alter Martin Oil's liability for storage tank releases *via* the "as is" provision in the contract of sale. *See Metzger*, 476 A.2d at 5; *see also Hutchison*, 513 Pa. at 202 n. 6, 519 A.2d at 391 n. 6; *Preston v. Saucon Valley School Dist.*, 666 A.2d 1120, 1127 (Pa.Cmwlth.1995)

(Narick, J., dissenting) ("The determination of whether a contract provision is ambiguous is a question of law resolved by the court, while resolution of . . . what was intended by the parties relevant to the ambiguous provision, is for the trier of fact."), *appeal denied*, 545 Pa. 673, 681 A.2d 1344 (1996).

¶ 35 Moreover, this court seriously questions whether the "as is" provision could bind any party other than the partnership and Martin Oil. It is a well established principle of law that a contract cannot impose obligations upon one who is not a party to the contract. *See, e.g., Matter of Estate of Barilla*, 369 Pa.Super. 213, 535 A.2d 125, 128 (1987); *Cumberland–Perry Area Vocational–Technical School Auth. v. Bogar & Bink*, 261 Pa.Super. 350, 396 A.2d 433, 435 (1978); *Puerto Rico Marine Management, Inc. v. Ken Penn Amusement, Inc.*, 574 F.Supp. 563, 566 (W.D.Pa.1983). Ordinarily, it is the party purchasing real estate that is bound by the terms of the bargain it strikes. *See, e.g., P.B.S. Coals*, 558 A.2d at 564. When a real estate contract or deed imposes obligations on the purchaser to act or refrain from acting, those terms do not bind later owners in the purchaser's chain of title unless the obligation runs with the land. *See, e.g., Estate of Hoffman v. Gould*, 714 A.2d 1071 (Pa.Super.1998); *Goldberg v. Nicola*, 319 Pa. 183, 178 A. 809 (1935); *Finley v. Glenn*, 303 Pa. 131, 154 A. 299 (1931).[9]

¶ 36 Here, Martin Oil Company asks to be relieved of liability for environmental contamination even though the contamination may have resulted from its own failure to comply with the STSPA. The STSPA is an act designed to protect the public welfare, and the bank's STSPA

---

9. To bind subsequent purchasers, the instrument that creates the obligation must conform to additional standards. For example, the covenant must be real, as opposed to personal, in nature; the covenant must touch and concern the land; and the parties must have intended the covenant to run with the land. *See Finley*, 303 Pa. 131, 154 A. 299; *DeSanno v. Earle*, 273 Pa. 265, 117 A. 200 (1922); *Hutchinson v. Thomas*, 190 Pa. 242, 42 A. 681 (1899). Obligations that typically run with the land include easements or rights-of-way.

claim is an attempt to enforce a statutory duty to comply with the act, a duty owed to the citizens of the Commonwealth. "Where public policy requires the observance of a statute, it cannot be waived by an individual or denied effect by courts, since the integrity of the rule expressed by the Legislature is necessary for the common welfare." *Boyd v. Smith*, 372 Pa. 306, 310, 94 A.2d 44, 46 (1953). Martin Oil's attempt to exculpate its liability for STSPA violations *via* the "as is" provision in the agreement of sale does not preclude a subsequent purchaser's claim for relief under the STSPA. *See id.*; *accord Bell, Secretary of Banking v. McAnulty*, 349 Pa. 384, 386, 37 A.2d 543, 544 (1944) ("Where the legislature has, by definite and unequivocal language, determined the public policy of this Commonwealth with regard to a particular subject, that pronouncement cannot be set aside and rendered unenforceable by a contract between individuals."); *cf., Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 215 (3d Cir.1994) (holding that any apportionment of liability of private actors for acts already done does not affect the primary duty they owe to the public at large pursuant to CERCLA), *cert. denied, Mead Corp. v. Beazer East, Inc.*, 514 U.S. 1065, 115 S.Ct. 1696, 131 L.Ed.2d 559 (1995).

¶ 37 Accordingly, we conclude that neither the bank's status as a foreclosure purchaser nor the "as is" provision in the contract of sale entitled Martin Oil to summary judgment.

### Cross–Appeal of Juniata Valley Bank

¶ 38 We decline to address the issues raised in Juniata Valley Bank's cross-appeal, which relate to the trial court's assessment of damages and attorneys' fees. Juniata Valley Bank asks this court to modify the final decree and award it damages for the diminution in the value of the Milroy property and 100% of its costs of

litigation. In light of our finding that the bank was not entitled to partial summary judgment on its STSPA claim, this request is premature. On remand, Martin Oil may be successful, and the issues raised by Juniata Valley Bank will then not arise. As the issues raised in the bank's cross-appeal are potentially moot, the court will not consider them further. *See Harger v. Caputo*, 420 Pa. 528, 533, 218 A.2d 108, 112 (1966) (Where case must be sent back for trial, appellate court "should not consider questions which may not arise unless exceptional circumstances exist or questions of great public importance are involved."); *accord Cohen v. Jenkintown Cab Company*, 238 Pa.Super. 456, 357 A.2d 689, 694 n. 5 (1976); *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 383–85, 390 A.2d 736, 745 (1978).[10]

### Conclusion

¶ 39 For the reasons stated herein, we vacate the final decree, reverse the entry of summary judgment in favor of Juniata Valley Bank, affirm the denial of Martin Oil's motion for summary judgment and remand the case for the trial court's further consideration.

¶ 40 Final decree vacated. Order which dispensed with the parties' motions for summary judgment affirmed in part and reversed in part. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

¶ 41 SCHILLER, J., files a Concurring Statement.

SCHILLER, J., concurring.

¶ 1 I concur with the majority's decision to vacate the trial court's entry of partial summary judgment in favor of Juniata Valley Bank (hereinafter the "Bank"), and to affirm the denial of summary judgment requested by Martin Oil Company. However, I write separately

---

**10.** Likewise, since the bank may prevail on its STSPA claim on remand, this court has not addressed whether Martin Oil was entitled to summary judgment as per the bank's other claims. We note that neither the trial court opinion nor the parties' briefs touch upon these other claims.

to emphasize my view that, on remand, if the fact finder finds Martin Oil responsible for contaminating the property, it must also be required to consider whether the Bank's recovery against Martin Oil should be precluded by its acquisition of the property on an "as is" basis.

¶ 2 The record discloses that, at the time the Bank agreed to finance the partnership's acquisition of the Milroy property, it was aware that the property had been used as a gasoline service station for many years. Nevertheless, the Bank did not require the partnership to obtain an environmental inspection of the property nor did it conduct its own, independent environmental assessment. The Bank did not insist, as a *condition* to lending the funds, that the partnership obtain indemnification for environmental contamination from Martin Oil. Indeed, the Bank's representative did not even review at closing the agreement of sale or the deed, both of which stated that the property was being purchased on an "as is" basis. Moreover, prior to purchasing the property itself at sheriff's sale, the Bank took no steps to evaluate and/or correct any environmental problems. It was only after a prospective buyer sought assurances that the property was not contaminated that the Bank obtained an evaluation and began the abatement process.

¶ 3 While it is clear that the Bank itself did not contaminate the property, it is equally clear that the Bank did not take reasonable steps to avoid acquiring an interest in contaminated property or to ensure in a timely fashion that any contamination would be remedied by the responsible individuals or entities. Having made a bad deal, the Bank is now seeking to recoup the investment it lost through a lack of due diligence. However, as the majority points out, the STSPA should not be available to financial institutions as a form of insurance, permitting mortgagee-turned owners to purchase contaminated properties with a blind eye and then simply look to others for the

costs of cleanup. Indeed, under the STSPA the Bank, as the current owner of the property, is presumptively liable to the state government to pay for such costs. *See* 35 P.S. § 6021.1311 ("Except as provided in subsection (b), it shall be presumed as a rebuttable presumption of law in civil and administrative proceedings that a person who owns or operates an aboveground or underground storage tank shall be liable, without proof of fault, negligence or causation, for all damages, contamination or pollution within 2,500 feet of the perimeter of the site of a storage tank containing or which contained a regulated substance of the type which caused the damage, contamination or pollution....").

¶ 4 Moreover, unlike a typical third party purchaser, the Bank was or should have been intimately involved in the negotiation for the original sale of the property to the partnership. While I agree with my colleagues in the majority that the "as is" language in the documents relating to this transaction does not afford Martin Oil relief as a matter of law, I believe that the jury should be able to ascertain the parties' intentions and determine whether this language, coupled with the Bank's conduct, effectively precludes the Bank from recovering against Martin Oil in this instance.

¶ 5 I realize that under the STSPA an owner of underground storage tanks is responsible for contamination such tanks cause to the property. However, I also recognize that, as long as the contamination is cleaned up, the state government is not concerned with who pays for the cost. It may well be that the owner of the property where these tanks are or were located has bargained with a potential purchaser based on an awareness of possible contamination, and that the potential purchaser is willing to accept this risk for a certain price. Under such circumstances, we should not allow the purchaser, and/or a mortgage lender who has acquiesced in the purchase, to hide behind the STSPA

and avoid the natural consequences of the deal they have made.[11]

¶ 6 I would therefore remand with instructions for the court to charge the jury that, if they find Martin Oil caused the contamination in question, they should also consider whether the Bank waived its right to recover based on initially securing its investment and subsequently purchasing the property on an "as is" basis.

---

**11.** The trial court rejected the Bank's claim for diminution in value and awarded the Bank only sixty percent of its attorneys fees, because of the Bank's negligence at the original closing and at Sheriff's sale. Adjudication and Decree Nisi, 9/3/97, at 2. I would agree with the trial court that damages may be limited by a party's negligence, but would go further in stating that such damages, including the costs of abatement, may be effectively precluded by the parties' negotiations and/or conduct surrounding the purchase of the property.