Jock NATIELLO and Jacqueline
Natiello, Petitioners

v.

**DEPARTMENT OF
ENVIRONMENTAL PROTECTION,**
Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 19, 2010.
Decided March 12, 2010.

W. Russell Carmichael, Media, for peti-
tioners.

Gina M. Thomas, Asst. Counsel, Norristown, for respondent.

BEFORE: PELLEGRINI, Judge, and BUTLER, Judge, and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Jock Natiello and Jacqueline Natiello (collectively, the Natiellos) appeal from an order of the Environmental Hearing Board (Board) dismissing their appeal and finding that the Department of Environmental Protection (Department) properly ordered them to comply with the Storage Tank and Spill Prevention Act (Act)[1] and the Department's storage tank regulations. For the reasons that follow, we affirm the Board.

The Natiellos were the owners of Jock's Service Station (Facility), a retail gasoline station and auto repair located on Route 13 and Washington Avenue in Delaware County, Pennsylvania. On the property were five underground storage tanks (USTs),[2] which the Department inspected in 1993 and 1994 in connection to an emergency response because the tanks were releasing contaminants and gasoline underground in violation of the Act[3] and Department regulations. The Department requested the Natiellos to perform a site characterization[4] pursuant to the Act and remove the USTs.[5] Because the Natiellos

---

**1.** Act of July 6, 1989, P.L. 169, *as amended,* 35 P.S. §§ 6021.101–6021.2104.

**2.** Three of the USTs each held 6,000 gallons of gasoline; one held an unknown quantity of gasoline and one held 500 gallons of used motor oil.

**3.** The Department also found violations of the Clean Streams Law, Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. §§ 691.1—691.1001; the Land Recycling and Environmental Remediation Standards Act (LRERS Act), Act of May 19, 1995, P.L. 4, 35 P.S. §§ 6026.101–6026.908.

**4.** 25 Pa.Code § 245.309(a) provides that after a reportable release from a storage tank is identified, the responsible party shall perform a site characterization. The objectives of a site characterization are to accomplish the following:

1) Determine whether additional interim remedial actions are necessary to abate an imminent hazard to human health or the environment;
2) Determine whether additional site characterization work is required upon completion of an interim remedial solution;
3) Determine or confirm the sources of contamination;
4) Provide sufficient physical data, through field investigations, to determine the regulated substances involved, and the extent of migration of those regulated substances in surface water, groundwater, soil or sediment;
5) Determine, from measurements at the site, values for input parameters including hydraulic conductivity, source dimensions, hydraulic gradient, water table fluctuation and fraction organic carbon necessary for fate and transport analysis;
6) Provide sufficient information to select a remediation standard;
7) Provide sufficient information to allow for completion of a remedial action plan or a design for remedial action.

**5.** Specifically, suspected and/or confirmed contamination was identified at the Facility as follows:

1. 2/21/93—Tanknology Inc. ("Tanknology") conducted a tightness tank on three USTs. Tank 002 failed the tightness test;
2. 2/25/94—Department Site Inspections in response to an emergency response noted the following:
   ● USTs had been out of service for over six years and had been recently put back into service;
   ● Tanknology conducted piping tightness testing on 2/23/94 and one piping run failed the test;
   ● Five inches of water was noted in one UST;
   ● Gasoline vapors were detected in at least three neighboring homes;
   ● The date of the first product delivery to the USTs appeared to correlate with the

were low on funds, they failed to perform the site characterization or take any corrective action. As a result, the Department secured funding, executed a "Consent Order and Agreement for Access" with the Natiellos to remove some of the USTs, and also cleaned up some of the contaminated soil around the Facility for a sum of $56,000. The Department did not perform a site characterization. The Natiellos were unable to reimburse the Department for its clean-up costs, and the parties entered into a mortgage agreement to secure the Natiellos' obligation to reimburse the Department for a portion of the response costs expended. The Natiellos then sold the Facility to Marcus Hook Borough (Borough) in the spring or summer of 2007 for $162,000, but the Borough refused to take responsibility for any costs of remediation for contamination of the Facility. After the sale of the Facility, the Natiellos reimbursed the Department $28,000 for its clean-up costs/mortgage lien

and retained $134,000 from the sale of the Facility.

On August 1, 2007, the Department issued an order with findings requiring the Natiellos as "current owners" to perform the site characterization and other remedial measures still necessary at the Facility. The findings noted that the Natiellos had not requested or received an extension of the regulatory 180-day time period for submitting site characterization reports, and the site characterization for the Facility was overdue.[6] The Natiellos filed an appeal with the Board neither disputing any of the facts nor disputing that they failed to perform the ordered action. Instead, they argued that they didn't have to comply with the Act because they were not "owners" and not the proper party that to which the order should have been directed. They contended that they no longer owned the property because the sale took place in the early spring or summer before the order was issued on August 1, 2007. Either

hydrocarbon vapor intrusion in the neighboring homes.

3. 11/24/98—The closure Report for the removed USTs included groundwater ("GW") sampling results that documents contamination above the Department clean-up standards.

6. Specifically, the order required that the Natiellos:

a. In accordance with 25 Pa.Code § 245.306, immediately perform the following interim remedial actions including:
- Identification and sampling affected or potentially impacted public and private water supplies;
- Identification of sensitive receptors of contamination migrating from the Facility including, but not limited to, basements and utility conduits;
- Evaluation of vapor intrusion to indoor air pathways; and Recovery of free product at the Facility and free product that has migrated from the Facility to any offsite surrounding location; and
- Performance of other interim remedial actions as are required to protect human health and safety.

b. No later than December 3, 2007, conduct a complete site characterization and submit a site characterization report ("SCR") that is complete and concisely organized and shall contain, as necessary, the elements described in 25 Pa.Code §§ 245.309 and 245.310. The SCR shall include a determination of the horizontal and vertical extent of contamination both on and offsite and shall identify the remediation standard selected.

c. Prepare and submit a written progress report to the Department. This report shall be due on October 12, 2007 and shall summarize all the site characterization and interim remedial response work performed up to October 1, 2007.

d. Unless the SCR demonstrates compliance with the selected remediation standard of Act 2, 35 P.S. § 6026.106(a) [LRERS Act], prepare and submit to the Department a Remedial Action Plan ("RAP") that is complete and concisely organized as described in 25 Pa.Code § 245.311. This RAP shall be submitted within the time frame established in 25 Pa.Code § 245.31(a).

the Borough was responsible as the current owner or the Department when it became an "occupier" by operation of the Consent Order when it performed remediation work. They further argued that they should have been excused from compliance because they paid the Department for the USTs' removal from the proceeds of the sale of the Facility; therefore, equitable principles of estoppel, laches or accord and satisfaction applied.

The Board disagreed and dismissed the appeal. The Board first considered whether the Natiellos were "owners" under the Act and found that they were by definition.[7] The Board also cited *Juniata Valley Bank v. Martin Oil Company*, 736 A.2d 650 (Pa.Super.1999), for the proposition that the definition of "owner" included both past and present owners, and past owners could be found liable for corrective action on a property after it had been sold to another. Therefore, the Borough was not responsible for the remediation, but the Natiellos still were. Also, the Department had no responsibility simply because it performed some remediation with the Natiellos' permission.

Regarding their arguments on equitable principles of estoppel, laches or accord and satisfaction, the Board explained that estoppel only applied if the Department made a promise to the Natiellos which induced action or forbearance on their part. Because the Natiellos did not offer any evidence that a promise was made to them by the Department that the Department would handle all of the remediation, and by the terms of their Consent Order and Agreement for Access it was clear that the Department only promised to empty and remove the USTs, and there was no evidence that the Department induced the Natiellos to refrain from meeting their regulatory obligations, estoppel did not apply. Similarly, the mortgage lien did not create any promise by the Department that would relieve the Natiellos of their regulatory duties. Further, there was no "accord and satisfaction" by payment of the mortgage for their portion of the debt incurred when the Department performed the remediation on their property. Finally, the Board addressed the Natiellos' argument that laches should apply because the Department knew of the contamination since 1994 but failed to communicate to the Natiellos that further remediation was necessary at the site. Citing *Lackawanna Refuse Removal, Inc. v. Commonwealth*, 65 Pa.Cmwlth. 372, 442 A.2d 423 (1982), the Board stated that it was well settled that the doctrine of laches could not be applied to the Department as it related to the enforcement of regulations. Ultimately, the Board found that the Department had adequately demonstrated that its order requiring the Natiellos to comply with the corrective actions was legal and appropriate and that they were "responsible parties" within the meaning of the Act. This appeal by the Natiellos followed.[8]

7. Initially, the Board relied on the definition of a "Responsible party" under its regulations. 25 Pa.Code § 245.1 defines "Responsible party" as:
   *A person who is responsible or liable for corrective action under the act. The term includes: the owner or operator of a storage tank;* the landowner or occupier; a person who on or after August 5, 1990, knowingly sold, distributed, deposited or filled an underground storage tank regulated by the act which never held a valid registration, with a regulated substance; and a person who on or after August 5, 1990, knowingly sold, distributed, deposited or filled an unregistered aboveground storage tank regulated by the act, with a regulated substance prior to the discovery of the release. (Emphasis added.)

8. Our scope of review of the Board's order is limited to determining whether its findings of fact are supported by substantial evidence and whether constitutional violations or er-

■ On appeal, the Natiellos make the identical arguments that they made before the Board. First, they argue that they are not "owners" as that term is defined by the Act because there is no indication that substances were removed from the USTs prior to 1984. They also contend that *Juniata Valley Bank* is of no precedential value because the language relied upon by the Board is *dicta.*

We agree with the Board that the Natiellos are "owners" as that term is defined under the Act. Section 103 of the Act, 35 P.S. § 6021.103, defines "owner" as follows: [9]

> (3) *In the case of an underground storage tank, the owner of an underground storage tank holding regulated substances on or after November 8, 1984,* and the owner of an underground storage tank at the time all regulated substances were removed when removal occurred prior to November 8, 1984.

The Department provided evidence which the Natiellos did not dispute that the USTs were holding gasoline and used motor oil, both regulated substances, in 1993 and 1994. Although the Natiellos' attempt to confuse the issue by arguing that the date specified in the definition refers to the time period during which the tank held the substances, not the time when it was "owned," the title of the word being defined in the Act is "owner" and not "storage tank." Therefore, the Board properly found that the Department proved that the Natiellos were the owners of the USTs after November 8, 1984, holding regulated substances.

■ As to whether the Natiellos can still be owners responsible for the remediation even though they sold the Facility to the Borough, *Juniata Valley Bank* clearly supports that they can be and are responsible for the remediation. In *Juniata Valley Bank,* Martin Oil Company operated a gasoline service station which had a number of abandoned underground storage tanks from a prior owner. It continued to run the service station and stored petroleum products for its operations in four of several previously installed USTs. Martin Oil vacated its property on August 10, 1989. In November 1989, it started negotiations for the sale of the property to Zeigler–Weiser Real Estate Partnership and only agreed to sell the property "as is" refusing indemnification. After the closing, the partnership operated a car dealership until it filed for bankruptcy. Juniata Valley Bank instituted foreclosure proceedings and later purchased the property at a sheriff's sale. Although there was a prospective buyer, it refused to purchase the property absent assurances of environmental soundness. Once an assessment was performed, it revealed contamination in both the soil and groundwater. Juniata Valley Bank began remediation and then sought to recover its costs with the trial court. The trial court granted partial summary judgment in favor of Juniata

---

rors of law were committed. *Eureka Stone Quarry, Inc. v. Department of Environmental Protection,* 957 A.2d 337 (Pa.Cmwlth.2008).

**9.** The first two subsections defining "owner" are not applicable. They provide the following:

> (1) In the case of a storage tank in use on the effective date of this act, or brought into use after that date, any person who owns or has an ownership interest in a storage tank used for the storage, containment, use or dispensing of regulated substances.
> (2) In the case of an aboveground storage tank in use before the effective date of this act, but no longer in use on the effective date of this act, any person who owned the aboveground tank, immediately before the discontinuance of its use, as well as any person who meets the definition of owner in paragraph (1).

Valley Bank regarding Martin Oil's liability under the Act.

On appeal to the Superior Court, Martin Oil argued that the Act did not allow a successor owner of a property to recover damages from a former owner. Further, the bank as the current owner was responsible for the costs of cleanup under the Act. Juniata Valley Bank argued that Martin Oil was strictly liable under the Act as an "owner" of an underground storage tank. The Superior Court cited the definition of "owner" at Section 103 of the Act, 35 P.S. § 6021.103, and stated, *"The statutory definition of owner includes both past and present owners,* and private citizens may maintain an action against 'any owner, operator, landowner or occupier' for 'any violation of any provision of [the] act.' *See* 35 P.S. § 6021.1305." [10] (Emphasis added.)

Although the Superior Court ultimately remanded the matter because there was insufficient evidence as to whether Martin Oil had any responsibility for causing the contamination, there was never any dispute made by the Natiellos that they caused the contamination at the Facility. Consequently, the Natiellos' argument that they are not owners who can be held responsible for the remediation is without merit.

■ The Natiellos also argue that the Department, as "occupier" of the site when the USTs were removed, assumed responsibility for any environmental remediation at the Facility, and if the Department caused further contamination at the Facility when it performed remediation at the Facility, it should be responsible for the harm, not them. Specifically, the Natiellos

contend that one of the contractors removed the USTs and drafted a detailed report stating that the "soil around thereof the USTs appeared to have gray staining and strong petroleum odor and the contamination was not localized." Despite this, "all excavated soil was used as backfill per DEP instruction."

What the Natiellos ignore is that they only gave the Department access to their property to perform some remediation but they did not convey a leasehold interest to the Department to make it a "responsible party" within the meaning of the Act. If any damage was caused by the Department, the Natiellos are still responsible as "owners" for that damage. Further, the Consent Order and Agreement for Access specifies at paragraph 6 that "The Department agrees that Mr. Natiello is not waiving any rights to damages (including contribution or indemnity) or injunctive relief which he may have at law or in equity for all personal injury (including death) *and property damage which would not have been incurred but for the performance of the Department's actions at the Property;* provided however, that this Consent Order and Agreement shall not create or otherwise affect such rights as they may or may not exist, and the Department expressly reserves any defenses it may have to any such claims or actions." Because the Consent Order and Agreement for Access covers this specific concern, the Natiellos' argument is without merit.

■ The Natiellos argue next that the Board erred in determining that the doctrine of laches prevents the Department from enforcing its regulations because the

---

10. 35 P.S. § 6021.1305(c) provides, in relevant part:

Except as provided in subsection (d), any person having an interest which is or may be affected may commence a civil action on his behalf to compel compliance with this act or any rule, regulation, or order or permit issued pursuant to this act by any owner, operator, landowner or occupier alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act.

Department took so long to act. They point out that the Department's order was issued on August 1, 2007, which was more than 13 years after the initial inspection of the Facility by the Department and more than nine years after the USTs were removed. The Natiellos argue that they have been prejudiced because they sold the property to the Borough for only $163,000 and they would not have sold it for such a low price had they known they would have been liable for more environmental work at the Facility.

Despite the Natiellos' reasoning for the sale price of the Facility, we agree with the Board that the doctrine of laches cannot be applied to the Department as it relates to enforcement of regulations. This Court has held that "in enforcing these environmental enactments DER is exercising a governmental function, so that even had its agents been mistakenly indulgent or lax in enforcing the laws, DER cannot now be prevented from performing its duty of enforcing the statutes." *Lackawanna Refuse Removal, Inc. v. Department of Environmental Resources,* 65 Pa.Cmwlth. 372, 442 A.2d 423, 426 (1982). The Board found that Department witnesses testified that they did not aggressively pursue enforcement actions against the Natiellos before the sale of the Facility because they knew they had "resource issues" and civil penalties or other enforcement actions were considered counterproductive. However, the original record reveals that the Department also did not sanction the violations and continued to monitor the Facility and have contact with the Natiellos. Therefore, the lengthy amount of time between the time of the inspection of the Facility and the issuance of an order was not due to lack of interest by the Department and failure to act as alleged by the Natiellos, and the doctrine of laches has no application.

■ Next, the Natiellos argue that the Department is precluded from enforcing its order by the doctrine of promissory estoppel because they believed that when the Department went onto their property to remediate the Facility pursuant to the Consent Order and Agreement for Access, it ended any responsibility that they had for remediation of the Facility. They rely on the language in the Consent Order which provides under paragraph F that "the parties wish to resolve this matter in an amicable fashion and without the need for litigation."

■ The doctrine of equitable estoppel applies when a Commonwealth agency has 1) intentionally or negligently misrepresented a material fact; 2) knowing or having reason to know that another person would justifiably rely on that misrepresentation; 3) or where the other person has been induced to act to his detriment because he justifiably relied on the misrepresentation. *E. Costello v. State Employes' Retirement Board,* 141 Pa.Cmwlth. 19, 596 A.2d 260 (1991). Here, the Consent Order was specifically drafted for the purpose of allowing the Department access to the Facility "in order to remove wastes from the tanks and to seal and/or remove the tanks" (paragraph E) due to the Natiellos' lack of funds. Paragraph 3 of the Consent Order provides: "Nothing set forth in this Consent Order and Agreement is intended, nor shall it be construed, to relieve Mr. Natiello's obligation to comply with any existing or subsequent statute, regulation, permit or order. In addition, nothing set forth herein is intended, nor shall it be construed, to authorize any violation of any statute, regulation, order or permit issued or administered by the Department." There is absolutely no language in the Consent Order indicating that the Natiellos are released from any further obligation regarding the Facility. There was

nothing in the Consent Order that would have given the Natiellos any reason to believe that the Department went on their property to perform a total remediation and that they were no longer responsible for any damages. There simply is no evidence of any promise.

■ Finally, the Natiellos argue that because they paid the Department for its remediation on their property and the Consent Order stated that the parties were going to "resolve the matter in an amicable fashion and without the need for litigation," there was an accord and satisfaction of any claim.[11] We disagree. The Consent Order provides the following at paragraphs 3 through 6:

3. Nothing set forth in this consent Order and Agreement is intended, nor shall it be construed, to relieve Mr. Natiello's obligation to comply with any existing or subsequent statute, regulation, permit or order. In addition, nothing set forth herein is intended, nor shall it be construed, to authorize any violation of any statute, regulation, order or permit issued or administered by the Department.

4. The Department specifically reserves the right to enforce this Consent Order and Agreement and to institute any action for any past, present or future violation of any statute, regulation, order or permit. These rights are cumulative, and the exercise of one right does not preclude the exercise of any other.

5. This Consent Order and Agreement shall not be introduced into evidence in any administrative or judicial proceeding except in a proceeding brought by the Department to enforce the terms of this Consent Order and Agreement.

6. The Department agrees that Mr. Natiello is not waiving any rights to damages (including contribution or indemnity) or injunctive relief which he may have at law or in equity for all personal injury (including death) and property damage which would not have been incurred but for the performance of the Department's actions at the Property; provided however, that this consent Order and Agreement shall not create or otherwise affect such rights as they may or may not exist, and the Department expressly reserves any defenses it may have to any such claims or actions.

(Reproduced Record at 168a.) Because the Consent Order specifically provides that the Natiellos were not relieved of any obligation to comply with any subsequent Department order or violate any subsequent Department order, there was no accord and satisfaction of any claim when they paid the Department for their portion of the remediation by the Department.

Consequently, for all of the reasons stated above, the order of the Board is affirmed.

Senior Judge KELLEY concurs in the result only.

### ORDER

AND NOW, this *12th* day of *March*, 2010, the order of the Environmental Hearing Board, dated November 24, 2008, is affirmed.

---

11. An accord and satisfaction requires a disputed debt, a clear and unequivocal offer of payment in full satisfaction, and acceptance and retention of the payment. *King v. Boettcher*, 150 Pa.Cmwlth. 490, 616 A.2d 57 (1992).