**James T. DRUM and Linda I. Drum, his wife, Appellants,**

v.

**SHAULL EQUIPMENT AND SUPPLY COMPANY and Larry Brown and Marlin Pentz, Appellees.**

Superior Court of Pennsylvania.

Argued Feb. 1, 2000.
Filed Aug. 15, 2000.
Reconsideration Denied Oct. 20, 2000.

Thomas R. Kline, Philadelphia, for appellants.

Timothy D. Appelbe, Pittsburgh, for Shaull Equipment and Brown, appellees.

BEFORE: DEL SOLE, EAKIN and TODD, JJ.

TODD, J.

¶ 1 James T. Drum ("Drum") and Linda I. Drum appeal the judgment entered on a molded verdict against them and in favor of Appellees Shaull Equipment and Supply Company ("Shaull"), Larry Brown and Marlin Pentz in the Allegheny County Court of Common Pleas.[1] Upon review, we reverse and remand this matter for a new trial.

¶ 2 The facts underlying this personal injury action sounding in negligence may be summarized as follows. Drum was employed as a heating and plumbing installer by George Roth Heating and Plumbing ("Roth"). (Trial Court Opinion, 5/28/99, at 2.) In February 1996, Shaull contracted

---

1. Appellants initially appealed from the May 28, 1999 Order denying their post-trial motions without first having judgment entered on the verdict. Such an appeal would be interlocutory absent final judgment and this Court would be without jurisdiction to hear it. See Johnston the Florist, Inc. v. TEDCO Construction Corp., 441 Pa.Super. 281, 657 A.2d 511, 514 (1995). Pursuant to an Order of this Court, however, Appellants entered final judgment on April 18, 2000. Since entry of final judgment during the pendency of an appeal is sufficient to perfect our jurisdiction, see id. at 513, we will address the appeal on its merits.

with Roth for the installation of an overhead radiant heating system to be suspended from the ceiling in the service garage area of Shaull's facility north of Pittsburgh in Bakerstown, Pennsylvania. (*Id.*) Larry Brown ("Brown") was Shaull's service manager while Marlin Pentz ("Pentz") was the branch manager of the Bakerstown branch. (*Id.*; N.T. Trial, 1/12/99, at 74.) Roth assigned Drum to the Shaull project. (Trial Court Opinion, 5/28/99, at 2.)

¶ 3 Early in the project, Drum and his co-workers were discussing the equipment necessary to complete the project. Included in the discussion was scaffolding to reach the ceiling area. (*Id.*) Brown apparently overheard this discussion and volunteered the use of Shaull's forklift. (*Id.*) The parties dispute the precise nature and effect of this exchange. Drum testified that Brown said: "You can use the forklift there. You can put a pallet on it and lift yourself up and work off the pallet." (N.T. Trial, 1/11/99, at 338.) Brown, however, testified that he had suggested that the Roth employees use the forklift in order to remove a piece of equipment, not for use as a work platform. Specifically, Brown testified that:

> When I gave them the forklift to use for the intentions that I gave it to them, to lower an old heating unit down, there was never any thought or mention or asking if they could use it for a work platform following the use of that forklift. They just went ahead and did it on their own.

(N.T. Trial, 1/7/99, at 51.) Brown did testify, however, that prior to Drum's injury he had become aware that the Roth employees were using the forklift and pallet as a work platform. (*Id.*)

¶ 4 It is undisputed that Drum was using the forklift and pallet as a work platform on February 15, 1996. On that date, the end of a section of heater pipe that Drum was installing came loose and began to fall. Drum attempted to catch the pipe as it fell toward the floor. In so doing,

Drum fell off of the pallet headfirst to the floor. As a result, he suffered injuries to his spine that rendered him partially paralyzed. (Trial Court Opinion, 5/28/99, at 3.)

¶ 5 Appellants sued Shaull, Brown and Pentz claiming negligence and strict liability. The case was tried to a jury under three specific theories of liability: (1) control of the workplace; (2) negligent supply of a chattel for business purposes; and (3) vicarious liability based on the peculiar risk doctrine.

¶ 6 During deliberations, the jury made two requests. The first was to see the written charge, which was denied. The second was to be recharged on negligence and contributory negligence, which was granted.

¶ 7 The jury initially returned a verdict by special interrogatories that, according to the trial court:

> indicated that it had found Defendants Brown and Pentz were not negligent, but attributed percentages of that causal negligence of 2.5% and 0.5% to each Defendant respectively. The Court reviewed these interrogatories and, in the presence of counsel, *sua sponte* informed the jury of this inconsistency and instructed the jury to return to the jury room to redeliberate.

(Trial Court Opinion, 5/28/99, at 4.) The precise words used by the trial court to inform the jury of this inconsistency and to direct them to take further action were "[w]e have an inconsistent verdict, incorrect verdict. I think the best thing to do is to send you back upstairs to correct it." (N.T. Verdict, 1/14/99, at 2.)

¶ 8 After the jury retired for redeliberation, Appellees moved for a mistrial on the basis that "[t]he jury obviously did not understand your instructions with respect to the law in this case; and it's evidenced by the verdict slip." (*Id.* at 4.) Appellants joined in the motion for a mistrial, which was denied by the trial court. (*Id.*)

¶ 9 When the jury returned again, the trial judge elected to read the special interrogatories himself due to the "inexperience of the tipstaff." (Trial Court Opinion, 5/28/99, at 5.) The jury found Shaull negligent, but Brown and Pentz not negligent, and found that Shaull's negligence was a substantial factor in causing Drum's injury. The jury further found, however, that Drum had been contributorily negligent in causing his own injury and apportioned his negligence at 58% and Shaull's at 42%. Because Drum's contributory negligence exceeded Shaull's negligence, the trial court molded the verdict to a defense verdict. Appellants' counsel then requested that the jury be polled. (*Id.* at 7.)

¶ 10 On the questions of whether Shaull and Pentz were negligent, the polling conformed to the written interrogatories. On the question of whether Brown was negligent, the trial court indicated that on the verdict slip ten jurors had answered "no" while two had answered "yes". During the initial poll of the jury, however, the trial court stopped the polling after three jurors (jurors number one, three and six) orally answered "yes". The trial court then repolled the jury on question two. On the second poll, juror six changed his answer to "no". Thus, the total on the second poll of this question was the same as on the written interrogatories. (*Id.* at 10.)

¶ 11 This difficulty recurred on the question of whether Shaull's negligence had caused Drum's injury. The trial court indicated that ten of the jurors had answered yes while two had answered no. On polling, however, a different combination of three jurors (jurors number three, four and five) orally answered "no", whereupon the trial court stopped the polling and repeated the question. (*Id.* at 13.)

¶ 12 On the second poll, juror number two, who had answered "yes" on the first poll, answered "no", prompting the trial court to repeat the question and the vote totals as found on the written interrogatories. On the third poll, jurors number two

and three answered "no". The poll then continued:

> THE COURT: Juror Number 4?
>
> JUROR NUMBER 4: No. I'm sorry. No.
>
> THE COURT: Juror Number 5?
>
> [DRUM'S COUNSEL]: Four no?
>
> JUROR NUMBER 4: I apologize, yes.
>
> THE COURT: You mean, Juror Number 4 means yes. Juror Number 5?
>
> JUROR NUMBER 5: No.
>
> THE COURT: All right. Well, that's still three no's. We have 10 to 3.

(*Id.* at 13–14.)

¶ 13 The trial court then questioned whether the jury was "still confused about the question" or whether there had been a scrivener's error. In response to the trial court's question, the following exchange occurred:

> THE FOREMAN: I believe we're just—some people are confused.
>
> THE COURT: They're confused about the answer?
>
> THE FOREMAN: Yes.

(*Id.* at 14–15.) The trial court then asked the jury to retire to "get the answer straight." (*Id.* at 16.) When they returned, the polling on the question of Shaull's causation of Drum's harm conformed to the written interrogatories.

¶ 14 The next question was whether Drum was contributorily negligent. During the poll, juror number four answered "no". The trial court stated that the verdict slip indicated a unanimous vote and asked: "Does Juror Number 4 not understand the question? Was your vote totalled incorrectly by the Foreman or are you confused when I'm asking you orally what your vote was?" (N.T. Verdict, 1/14/99, at 20.) Juror number four replied, "I was confused now." The exchange then continued:

> THE COURT: Okay. Do you believe by a preponderance of the evidence that the

Plaintiff, James Drum, was contributorily negligent?

JUROR NUMBER 4: Yes, he was, sir.

(*Id.*) The polling on the final two questions conformed to the verdict slip and the jury was released. (*Id.* at 20–24.)

¶ 15 The trial court denied appellants' post-trial motions for a new trial and the present appeal followed. On post-trial motions and in the present appeal, Appellants raised seven allegations of error.[2] Specifically, Appellants argue that they are entitled to a new trial because:

(1) no verdict was rendered at trial because the jury did not announce its verdict orally in open court;

(2) the jury was confused and unable to render a reasoned and rational verdict;

(3) the trial court improperly interfered with the jury's deliberation;

(4) the trial court erred in refusing to grant a binding instruction on Brown's negligence based on his alleged admissions;

(5) the trial court's instruction to the jury on the doctrine of peculiar risk was erroneous;

(6) the trial court's instruction to the jury on the doctrine of negligent supply of a chattel for business purpose was erroneous; and

(7) the trial court erred in refusing to delineate Appellants' three theories of negligence on the verdict slip.

¶ 16 In reviewing the trial court's refusal to grant post-trial motions for a new trial, we must determine "whether the lower court committed an abuse of discretion or an error of law which controlled the outcome of the case." *Ravin, Inc. v. First City Co.*, 692 A.2d 577, 580 n. 3 (Pa.Super.1997).

¶ 17 As a threshold issue, however, we first must address Appellees' contention that Appellants have waived their allegations of error regarding the jury instructions, the trial court's conduct during deliberations, and the impropriety in the announcement of the verdict, by failing to preserve them via appropriate objection at trial. After a thorough review of the record, we find that these issues were adequately preserved for our review.

¶ 18 As to Appellants' arguments regarding jury instructions, Appellants apparently submitted each of the requested instructions to the trial court in writing and made certain subsequent oral requests for modification.[3] At the charge conference, the trial court noted:

THE COURT: You guys have objections to every ruling that goes against you during these points for charge. You don't have to make an objection or an exception. If you are ruled against, it's noted.

\* \* \*

THE COURT: You can do it at the end of the charge, too, if you want, but that's up to you. Nothing is deemed waived if your charges are not accepted.

(N.T. Trial, 1/12/99, at 185.) Thus, Appellants' allegations of error regarding the jury charge were preserved at trial.

¶ 19 Appellees also challenge the preservation of Appellants' claims regarding the trial court's conduct during deliberation and the announcement of the verdict. While Appellants' counsel failed to articulate specific objections during jury deliberations, these claims were preserved by virtue of Appellants having previously joined Appellees' motion for a mistrial due to jury confusion. Once an issue has been raised, counsel is not required to continue repeat-

---

**2.** We have paraphrased and renumbered Appellants' allegations of error for editorial convenience.

**3.** The original record transmitted from the trial court, does not contain the requested points for charge on peculiar risk and negligent supply of a chattel for business purposes. The record reveals, however, that they were discussed at the charge conference and they were included in the reproduced record.

ing the objection. *See Collins v. Cooper*, 746 A.2d 615, 619 n. 2 (Pa.Super.2000) (holding issue not waived by counsel's failure to object during closing argument to opposing counsel's reference to previously disputed testimony already admitted by trial court over counsel's objection; "[s]ince the trial court overruled this objection and admitted the ... testimony into evidence, it would have been redundant for appellant to repeat his already overruled objection during closing argument.").

¶ 20 We shall consider the merits of Appellants' first two arguments—that there was no verdict in the present case and that the jury was confused—in tandem. On the first issue, Appellants' argument is based on the fact that there was no verdict because the trial court employed written interrogatories to the jury that were not read by the jury foreman. Under Pennsylvania law, it is well settled that "the only verdict is that which is announced orally in court by the jury, and if at any time any juror disagrees, with or without poll, before the verdict is recorded then there is no verdict." *Barefoot v. Penn Central Transp. Co.*, 226 Pa.Super. 558, 323 A.2d 271, 272 (1974).

¶ 21 We note that the use of written interrogatories to the jury is appropriate and has become commonplace in complex litigation. *See Henery v. Shadle*, 443 Pa.Super. 331, 661 A.2d 439, 442 n. 1 (1995). In the present case, the jurors orally announced that they had reached a verdict and the trial judge read the jury's responses to the written interrogatories in open court in the presence of the parties and their counsel. (N.T. Verdict, 1/14/99, at 2, 6–7.) Ordinarily this would be sufficient to meet the requirements of oral pronouncement of the verdict, especially when combined with a subsequent poll of the jury.

¶ 22 In the present case, however, despite their oral pronouncement that they had reached a verdict and their answers to the written interrogatories, the jury, when polled, announced votes that did not conform to the vote totals indicated on two of the written interrogatories. Although the trial court ultimately did obtain votes during polling that conformed to the written totals for each of those questions, the confusion revealed during the polling leads us to question whether certain jurors had disagreed with the verdict prior to its having been recorded. The transcript of the announcement of the verdict shows that on these two questions, at least one of the jurors may have disagreed with the verdict. It is unclear from the record whether these jurors in fact disagreed with the verdict or whether they merely were confused by the oral questioning. Because the jury announced that it had reached a verdict, submitted a verdict slip indicating this and, ultimately, agreed with the verdict when polled, we will not reverse on the basis that the jury failed to reach a verdict.

¶ 23 Our inquiry does not end with this conclusion, however, because it is clear that the verdict ultimately delivered by the jury was inherently inconsistent and should not have been permitted to stand. The difficulties with the oral polling of the jury were symptomatic of the confusion that appears to have pervaded this jury's deliberations. This confusion provides an independent basis to grant Appellants a new trial.

¶ 24 Jury confusion was apparent almost from the outset of the jury's deliberations. The jury first asked to view the written charge. When the trial court refused that request, the jury requested to be recharged on a certain point. Questions from the jury and requests to be recharged are common and most certainly do not create a presumption of jury confusion. In the present case, however, these requests were the first indicia of a problem that soon should have become readily apparent.

¶ 25 The jury's confusion was demonstrated by their initial inconsistent verdict

that prompted the joint mistrial motion, by the inconsistencies and changes in the votes during the oral poll, and by the jury foreman's statement that the jury was "confused." This confusion further was apparent in the inconsistencies between the votes of two of the individual jurors. Jurors number three and five consistently voted that Shaull had not been negligent and that Shaull's negligence had not been a proximate cause of Drum's injury. (N.T. Verdict, 1/14/99, at 8, 12–14, 18.) However, those same two jurors irreconcilably joined in the unanimous apportionment of 42% negligence to Shaull. (*Id.* at 22–23.)

¶ 26 If a jury clearly is confused, and the trial court cannot rectify the confusion by appropriate instructions, a new trial is warranted. *See Pennsylvania Dep't of Transp. v. Nemiroff*, 42 Pa. Cmwlth. 478, 401 A.2d 10, 12 (1979) ("Where the record discloses a substantial degree of uncertainty and confusion in the minds of the jury, justice requires the granting of a new trial."); *Leopold v. Davies*, 246 Pa.Super. 176, 369 A.2d 868, 870 (1977) ("Since we are convinced that the jury was . . . confused as to the application of the law of contributory negligence in this case, a new trial is required."). We hold, therefore, that it was reversible error to permit the jury to continue their deliberations and to record a verdict after it became painfully obvious that this jury was hopelessly confused. Accordingly, we are constrained to reverse the learned trial court's denial of Appellants' post-trial motion on the issue of jury confusion and remand this matter for a new trial.[4]

¶ 27 Other issues remain which were raised by Appellants on appeal, have been briefed adequately, and are likely to recur on remand. For the guidance of the parties and the trial court, therefore, we will address these issues.

¶ 28 Appellants argue that the trial court erred in its charge to the jury on Pennsylvania law regarding the doctrine of peculiar risk by failing to include in the instruction specific language pertaining to vicarious liability. We have reviewed the charge and conclude that, when viewed in its entirety, it accurately, albeit in a less than concise manner, sets forth Pennsylvania law as articulated by this Court regarding this doctrine.

¶ 29 We question, however, whether such an instruction was warranted in the present case. Indeed, in their brief, Appellees argue, *inter alia*, that "the evidence at trial failed to justify a charge on the peculiar risk doctrine in any event." (Appellees' Brief at 12.)

¶ 30 We have stated that the peculiar risk doctrine is an exception to "[t]he established law in Pennsylvania [that] provides that an employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." *Edwards v. Franklin & Marshall College*, 444 Pa.Super. 1, 663 A.2d 187, 189 (1995). Under this exception, "an employer may be liable for the negligence of its employee/independent contractor where the work to be performed by the independent contrac-

---

4. Having done so, we need not reach Appellants' arguments that the trial court improperly interfered with the jury's deliberations. We also will not address Appellants' argument that the trial court erred in failing to delineate their three separate theories of negligence on the verdict slip. In support of this proposition, Appellants make only a general argument that the verdict slip "violated [Appellants'] fundamental right to due process under the Pennsylvania and United States Constitutions." (Appellants' Brief at 45.) Appellants do not develop this argument or cite to any caselaw in support of it. Accord-

ingly, we deem it to have been waived. *See* Pa.R.A.P. 2119; *Collins v. Cooper*, 746 A.2d 615, 619 (Pa.Super.2000) (holding claim of error waived when "appellant has failed to cite any authority in support of a contention"); *Juniata Valley Bank v. Martin Oil Co.*, 736 A.2d 650, 661–62 n. 8 (Pa.Super.1999) (same). Even if we were to reach the merits of this issue, it is clear that the trial judge's discretion regarding the use and content of special interrogatories to the jury is broad. *See Henery*, 661 A.2d at 442 n. 1. In the present case, that discretion was not abused.

tor involves a special danger or peculiar risk."[5] *Id.*

¶ 31 Pennsylvania has adopted Sections 416 and 427 A of the Restatement (Second) of Torts as setting forth the controlling law regarding the peculiar risk doctrine. *Emery v. Leavesly McCollum*, 725 A.2d 807, 814 (Pa.Super.1999) (citing *Philadelphia Elec. Co. v. James Julian, Inc.*, 425 Pa. 217, 228 A.2d 669 (1967)). These sections provide:

§ 416. Work Dangerous in Absence of Special Precautions

One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

§ 427 A. Work Involving Abnormally Dangerous Activity

One who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity, is subject to liability to the same extent as the contractor for physical harm to others caused by the activity.

Restatement (Second) of Torts §§ 416 and 427 A.

¶ 32 *Emery* is the most-recent pronouncement of this Court, sitting *en banc*, regarding the applicability of the peculiar risk doctrine. In *Emery* we set forth the two-pronged test to be applied by the trial court to determine whether the peculiar risk doctrine applies to a particular case as follows:

As set forth in our prior cases, the determination of whether either of these exceptions applies involves a two-fold test: (1) whether the risk is foreseeable to the owner at the time the contract is executed, *i.e.* would a reasonable person foresee the risk and recognize the need to take special measures; and (2) whether the risk is different from the usual and ordinary risk associated with the general type of work done.

*Id.* at 814.

¶ 33 This Court emphasized in *Emery* that "because the 'peculiar risk/special danger' doctrines are exceptions to a general rule [of non-liability], they should be viewed narrowly." *Id.* Moreover, we repeated that:

The risk/danger must be recognizable in advance and contemplated by the owner at the time the contract was formed. It must not be a risk/danger "created solely by the contractor's 'collateral negligence,' ... [*i.e.*], negligence consisting wholly of the improper manner in which the contractor performs the operative details of the work."

*Id.* (citations omitted). Finally, we noted in *Emery* that the determination of whether the facts of a particular case constitute a peculiar risk is a mixed question of law and fact and that "the trial judge may make this determination as a matter of law in clear cases." *Id.* (citation omitted). In the present case, the trial court made no such determination, deciding instead, when ruling on Appellees' motion for a compulsory nonsuit, "to let the case go to the jury." (N.T. Trial, 1/12/99 at 13.) This was error.

¶ 34 We question whether Shaull could have foreseen that Roth's employees would use Shaull's forklift as a work platform in order to perform their obligations under the contract at the time that the contract was entered into between the parties. We further question whether the risk in the present case is different from the usual

_____
5. In this area of the law, the term "employer" refers to the individual or entity that hires the

independent contractor, in this case, Shaull.

and ordinary risk associated with the general type of work to be done. We note that this second prong of the test consistently has been applied to determine whether the nature of work to be performed pursuant to the contract, not the particular tools or instrumentalities to be utilized, constitutes a peculiar risk. *See, e.g., Donnelly v. Southeastern Pa. Transp. Auth.*, 708 A.2d 145, 148–49 (Pa.Cmwlth. 1998) (working on a scaffold with only auxiliary lighting did not constitute a peculiar risk); *Motter v. Meadows Ltd. Part.*, 451 Pa.Super. 520, 680 A.2d 887, 891 (affirming trial court's grant of summary judgment based on holding that digging a trench in soft shale did not constitute a peculiar risk) (Pa.Super.1996); *Edwards*, 663 A.2d at 191 ("Clearly, the risk that Edwards might fall through the roof, given the known deteriorated condition of the building ... did not present a 'special danger' or 'peculiar risk.'"); *Steiner v. Bell of Pa.*, 426 Pa.Super. 84, 626 A.2d 584, 587 (1993) (affirming grant of judgment on the pleadings based on holding that working on a ladder on overhead utility lines did not constitute a peculiar risk); *Peffer v. Penn 21 Assoc.*, 406 Pa.Super. 460, 594 A.2d 711, 714 (1991) ("work on a ladder while tightening bolts of a steel structure is not a peculiar risk for an individual employed by a steel erector company.").

¶ 35 Finally, we note that, contrary to Appellants' assertion, *Cox v. Turner Constr. Company*, 373 Pa.Super. 214, 540 A.2d 944 (1988) does not compel a finding that the facts of the present case constitute a peculiar risk. In *Cox*, we concluded, based on the facts of that case, that "[t]he operation of an unenclosed hoist contrary to safety regulations constitutes a peculiar risk of harm." *Id.* at 950. We do not have the benefit of a detailed analysis of the legal underpinnings of the peculiar risk doctrine as applied to the facts of the case in *Cox*.[6] To the extent that the result in *Cox* was based on the fact that the hoist was operated in a manner "contrary to safety regulations," however, subsequent decisions of this Court have made clear that a violation of safety standards or regulations standing alone is not sufficient to constitute a peculiar risk. *See Lorah v. Luppold Roofing Co.*, 424 Pa.Super. 439, 622 A.2d 1383, 1386 (1993) ("[T]he tenor of our law is that the violation of safety conditions alone cannot be the basis for a finding that the Peculiar Risk Doctrine applies, as many, if not most, industrial [accidents] result from a failure to follow ... safety regulations."); *Peffer*, 594 A.2d at 713 ("Violation of safety conditions alone, however, cannot be a basis for carving out exceptions to the rule that the owner is not liable for injuries incurred by employees of a subcontractor, as to do so would nullify the rule for all practical purposes since many, if not most, industrial accidents can be attributed to a failure to comply with safety regulations of either state or federal agencies.").

¶ 36 The present case went to trial in early January 1999, one month before this Court filed its *en banc* opinion in *Emery*. We acknowledge, therefore, that the trial court did not have the benefit of this Court's analysis in *Emery* when it decided Appellees' motion for a compulsory nonsuit or when it charged the jury in the present case. Accordingly, we direct the trial court on remand to determine as a threshold issue whether the facts of this case meet the criteria for application of the peculiar risk doctrine.

■ ¶ 37 Appellants also argue that the trial court erred in its charge to the

---

**6.** It is reasonable to suppose, however, that the parties in *Cox* indeed contemplated the use of the hoist by the independent contractor when the contract was entered into. The project at issue in *Cox* was the construction of a skyscraper and the independent contractor was hired to install the elevators and escalators in the building. As the building's elevators obviously could not have been in place and functioning prior to the completion of the independent contractor's efforts, it is reasonable to assume that the parties contemplated that the independent contractor would use that hoist to reach the upper levels of the unfinished skyscraper.

jury on Pennsylvania law regarding negligent supply of a chattel for business purposes pursuant to Section 392 of the Restatement (Second) of Torts.[7] The parties do not dispute the propriety of the trial court's general instruction under Section 392. Appellants argue, however, that the trial court erred in including in its charge an instruction based on Comment e to Section 392, which provides:

e. *Supplying tools for workmen.* One who employs another to erect a structure or to do other work, and agrees for that purpose to supply the necessary tools and temporary structures, supplies them to the employees of such other for a business purpose. This is true irrespective of whether the structure or work when finished is to be used for business or residential and social purposes. On the other hand, if it is understood that the person who is to do the work is to supply his own instrumentalities, but the person for whom the work is to be done permits his own tools or appliances to be used as a favor to the person doing the work, the tools and appliances are supplied as a gratuity and not for use for the supplier's business purposes.

Restatement (Second) of Torts, § 392 cmt. e.

¶ 38 This court has relied upon Section 392 as setting forth Pennsylvania law regarding negligent supply of a chattel. *See, e.g., Fullard v. Urban Redev. Auth. of Pittsburgh*, 222 Pa.Super. 184, 293 A.2d 118, 120 (1972). Moreover, we have relied as well upon the text of the Comments to Section 392, including Comment e. *See Id.* (relying on the first sentence of Comment e in holding that "Comment e of § 392 specifically states that one who makes such an agreement is supplying the tools for a business purpose, and, therefore, is subject to the higher duty of care imposed upon such a supplier."). *See also, Donaldson v. Pennsylvania. Dep't of Transp.*, 141 Pa. Cmwlth. 474, 596 A.2d 269, 278 (1991) (holding on the facts of that case that Comment e to Section 392 was inapplicable).

¶ 39 Appellants argue that the trial court should not have included this instruction because it applies "*only* in the situation were [sic] where there is a preexisting agreement that the contractor will supply his own instrumentalities." (Appellants' Brief at 43 (emphasis original).) Appellees counter that the plain language of Comment e "simply states that 'if it is *understood* that the person who is to do the work is to supply his own instrumentalities.'" (Appellees' Brief at 19, quoting Restatement (Second) of Torts § 392, Comment e (emphasis original in Appellees' Brief).) [8]

¶ 40 In the absence of an integrated, written agreement, and the record reveals

7. Section 392 provides:
§ 392. Chattel Dangerous for Intended Use
One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied
(a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or
(b) if he fails to exercise reasonable care to discover its dangerous condition or

character, and to inform those whom he should expect to use it.
Restatement (Second) of Torts § 392.

8. Although this section does not use the term agreement or contract and refers instead to the parties' understanding, we will analyze this issue under contract law. *See Black's Law Dictionary* 1526 (6 th ed.1990) (defining "understanding" as "[i]n the law of contracts, an agreement" and noting that "[t]his is a loose and ambiguous term, unless it be accompanied by some expression to show that it constituted a meeting of the minds of parties upon something respecting which they intended to be bound").

no such agreement between Roth and Shaull, "[t]he determination of the contents of a mixed written and oral contract is for the factfinder unless there is no conflicting evidence." *Peugeot Motors of America, Inc. v. Stout*, 310 Pa.Super. 412, 456 A.2d 1002, 1005 (1983). Thus, the trial court properly permitted the jury, with appropriate instruction, to determine the nature of the understanding between Roth and Shaull regarding who would provide the tools and instrumentalities necessary to complete the work. Accordingly, we find no error in the trial court's instructions to the jury under this section.

¶ 41 Finally, Appellants argue that the trial court erred in refusing to grant a binding instruction on the issue of Brown's negligence. The sole case cited by Appellant in support of this proposition, *Duquesne Light v. Woodland Hills School District*, 700 A.2d 1038 (Pa.Cmwlth.1997), actually supports Appellees' argument that the refusal to grant the instruction was appropriate. In *Duquesne Light*, the Commonwealth Court held that the trial court committed reversible error by granting a binding instruction on negligence because "[t]he issue of whether a party is negligent is appropriate for the jury to determine." *Id.* at 1046. Moreover, the Commonwealth Court stated that "[w]here there is any evidence which alone would justify an inference of the disputed fact, it must go to the jury, no matter how strong or persuasive may be the countervailing proof." *Id.*

¶ 42 The Commonwealth Court's reasoning in *Duquesne Light* is consistent with the principles of negligence and the purview of the jury that have been enunciated by this Court. *See Dible v. Vagley*, 417 Pa.Super. 302, 612 A.2d 493, 495 (1992) ("binding instructions may not be given if there is a question of fact properly submissible to the jury"); *Dougherty v. Boyertown Times*, 377 Pa.Super. 462, 547 A.2d 778, 787 (1988) ("Negligence is a question for the jury to determine upon proper instruction. The court should not remove

the question from the jury unless the facts leave no room for doubt."). We hold, therefore, that the trial court did not abuse its discretion in refusing to give an instruction that Appellee Brown was negligent as a matter of law.

¶ 43 Based on the foregoing, we vacate the judgment entered April 18, 2000 and reverse the trial court's Order of May 28, 1999 denying Appellants' Motion for Post–Trial Relief. We remand this matter for a new trial.

¶ 44 Reversed and remanded. Jurisdiction relinquished.